Thomas O. BENNETT, Jr., and James
B. Bonham Corp., Petitioners,

v.

Randy REYNOLDS, Respondent.

No. 08–0074.

Supreme Court of Texas.

Argued Dec. 15, 2009.

Decided June 25, 2010.

Rehearing Denied Aug. 20, 2010.

Douglas W. Alexander, Susan S. Vance, Alexander Dubose & Townsend LLP, Aus-tin, Keith Woodley, Woodley & Dudley, Comanche, Jimmy Nixon Shook, Childress & Shook, San Saba, for Petitioners.

Richard T. Miller, Darrel Dwayne Spinks, Miller & Spinks, LLP, San Saba, David E. Keltner, John Thomas Wilson IV, Marianne M. Auld, Kelly Hart & Hallman LLP, Fort Worth, for Respondent.

Paul M. Terrill III, The Terrill Firm, PC, Austin, for amicus curiae Pacific Legal Foundation.

Justice WILLETT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, and Justice GUZMAN joined, and in all but Part II(A)(1) of which Justice JOHNSON joined.

This case involves an extended drought, missing cattle, and feuding neighbors. In 2002 these factors sparked litigation over the auction of thirteen head of wandering cattle, culminating in a judgment for actual and exemplary damages. Today we clarify the standards for reviewing exemplary damages, which the United States Supreme Court has subjected to increasingly strict due-process scrutiny.

\*       \*       \*       \*       \*       \*

Texas is the top cattle-raising state in the nation,[1] home to 13.8 million head that contribute $15 billion to the state economy.[2] The Lone Star State thus looks unkindly on cattle theft, which unfortunately is not a colorful vestige of yesteryear.[3]

---

1. TEX DEPT. OF AGRIC., THE TEXAS LIVESTOCK INDUS-TRY: A REVIEW OF CURRENT ECONOMIC CONDITIONS 3 (2008), *available at* http://www.agr.state.tx.us/vgn/tda/files/1848/23296_Texas% 20Live-stock% 20Industry% 20Status.pdf.

2. *Id.;* Tex. S. Res. 545, S.J. of Tex., 81st Leg., R.S. 829, 830 (2009).

3. Amid tough economic times, livestock crimes have risen in Texas, prompting the Legislature in 2009 to stiffen criminal penalties for stealing cattle and certain other livestock. *See* Act of May 12, 2009, 81st Leg., R.S., ch. 139, § 1, 2009 Tex. Gen. Laws 461, 462 (amending TEX. PEN.CODE § 31.03(e)).

This case arose along the Colorado River in San Saba County, where cattle ranching is common and where cattle-raising neighbors Randy Reynolds and Thomas O. Bennett, Jr. nursed a longtime feud. In 2002 Reynolds sued Bennett and a corporate landowner, the James B. Bonham Corporation, of which Bennett served as president, alleging they had sold thirteen head of Reynolds's cattle that had strayed down a dry riverbed and onto Corporation land. Bennett was acquitted of felony theft, but a civil jury found a conversion and assessed $5,327.11 in actual damages (the cattle's market value) plus combined exemplary damages of $1.25 million: $250,000 against Bennett and $1 million against the Corporation. Both insist there is no basis for exemplary damages, and that the exemplary-to-compensatory ratios here—47:1 as to Bennett and 188:1 as to the Corporation (235:1 combined)—offend the "substantive" limitations of the Due Process Clause of the Fourteenth Amendment.[4] In addition, the Corporation argues that Bennett's acts cannot be imputed to the Corporation.

We agree with the court of appeals that exemplary damages are justified against both Bennett and Bonham Corporation. That said, we are constrained by governing Supreme Court ratio analysis, which in recent years has repeatedly struck down outsized awards on due-process grounds.[5] The jury's $1.25 million award in this case was similarly excessive, so we remand to the court of appeals for remittitur consistent with controlling ratio analysis.

## I. Background

The Colorado River separates the northern edge of San Saba County from Mills County. When the river is flowing, it forms a natural property barrier, and some landowners abutting the Colorado rely on the river to confine their cattle. However, when the river runs dry, as it did in the summer and fall of 2000, cattle in unfenced areas often wander along and across the dried riverbed and wind up in neighboring pastures.[6] The stray cattle are usually located and returned, but occasionally they escape for good.

The Bonham Corporation owns the 914-acre Bennett Ranch along the Colorado. Sisters Brenda Bennett and Julie Munden purportedly own the Corporation,[7] and their father, Thomas Bennett (Bennett), is the unsalaried and non-shareholder president who lives on the ranch in a Corporation-owned home. The Corporation owns no cattle, but Bennett does, and he runs them on the Corporation's property. Upriver and on the same side, Randy Reynolds runs cattle on a 320-acre pasture leased from his mother-in-law.

The Bennett–Reynolds dispute dates back to a 1996 quarrel over construction costs for a new barbed-wire fence dividing their properties. Reynolds discovered Bennett and a Corporation work crew bull-

---

**4.** *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 417–18, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

**5.** *See generally Philip Morris USA v. Williams,* 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007); *State Farm,* 538 U.S. 408, 123 S.Ct. 1513; *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

**6.** As the court of appeals noted, San Saba County is an "open range" county, meaning ranchers are not required to fence in their cattle. 242 S.W.3d 866, 870.

**7.** There is some uncertainty as to who owns the Corporation. Thomas Bennett produced two stock certificates, one for each daughter. But those certificates were not the first ones issued, and Bennett claimed he had lost all the other records.

dozing a section of old fence, and Bennett suggested they split rebuilding costs. Reynolds declined, and Bennett eventually filed a small-claims suit against Reynolds in December 2000. Reynolds prevailed at trial and, while still in the courtroom, mentioned to Bennett he was missing some cattle and asked if Bennett had seen them. Bennett immediately went upstairs to the sheriff's office and accused Reynolds of stealing *his* cattle. Reynolds in turn reported his own cattle missing. That same day, the sheriff accompanied Bennett to the Reynolds property, and a deputy joined Reynolds at the Bennett place. No missing cattle were found.[8]

Reynolds says Bennett knowingly led the officers on a wild goose chase— "searching for cattle he knew were long gone"—because Bennett three months earlier had already rounded up and auctioned Reynolds's strays. In October 2000 Reynolds noticed that 23 head of cattle were missing.[9] Reynolds spotted six of them next door at the Bennett Ranch and retrieved them. Unable to find the others, he reported them missing to the Texas and Southwestern Cattle Raisers Association (TSCRA).[10] Also around that time, Bennett ordered two Bonham Corporation ranch hands to help him round up and load cattle Bennett had identified for auction; they trailered and sold thirteen head, which netted $5,327.11. At the time, both ranch hands raised concerns with Bennett that the cattle were not his.

Roughly a year later, one of the ranch hands, Larry Grant, told Reynolds he suspected Bennett had auctioned some of Reynolds's cattle. While driving to the auction, Grant purchased a disposable camera and took photographs of the cattle, some of which bore a brand registered to Reynolds. Grant gave the photographs to TSCRA after he quit his job with the Corporation, shortly after the auction.

In early 2002 Bennett was indicted for cattle theft. Upon Bennett's indictment, Reynolds sued him and Bonham Corporation for conversion and sought exemplary damages in excess of the statutory caps, alleging their misconduct was malicious and constituted third-degree felony theft under Chapter 31 of the Penal Code.[11]

Bennett was acquitted of the criminal charges in 2003, but the civil case proceeded, and Bennett counterclaimed, alleging Reynolds had conspired with Larry Grant to falsely accuse Bennett of cattle theft.

8. Reynolds insists that "Bennett attempted the despicable, trying to send the innocent victim of his crime to prison." But Reynolds was never criminally charged, nor did he sue Bennett for besmirching his name. The matter was resolved swiftly and conclusively within hours.

9. This was not uncommon; Reynolds noted a dozen-plus times when drought conditions facilitated cattle escapes, though he recovered most of the strays.

10. TSCRA "is a grass roots organization composed of cattle producers and operators of all sizes located primarily in Texas and Oklahoma." TSCRA Homepage, http://www.texas cattleraisers.org/aboutTSCRA.asp (last visited June 21, 2010). One of TSCRA's services is stationing livestock theft investigators who are commissioned as special rangers by the Texas Department of Public Safety and "assist in recovering stolen livestock and equipment and apprehending the thieves." *Id.*

11. At the time, Section 31.03(e)(5)(A) of the Penal Code provided that stealing "10 or more head of cattle ... stolen during a single transaction and having an aggregate value of less than $100,000" constituted a third-degree felony. Act of May 29, 1995, 74th Leg., R.S., ch. 318, § 9, 1995 Tex. Gen. Laws 2734, 2738, *amended by* Act of May 12, 2009, 81st Leg., R.S., ch. 139, § 1, 2009 Tex. Gen. Laws 461, 462. *See also* TEX. CIV. PRAC. & REM CODE § 41.008(c)(13) (exempting such conduct from the statutory caps on exemplary damages).

While neither side disputed that Bennett had directed two ranch hands to sell thirteen head of cattle and that the sale netted $5,327.11, the parties disputed everything else. They disputed whether Bennett or Reynolds owned the cattle, Bennett's state of mind regarding who owned the cattle, and the culpability of Bonham Corporation for any wrongdoing by Bennett.

The jury sided with Reynolds, finding (1) Bennett and the Corporation both converted Reynolds's cattle, (2) they did so with malice, and (3) they committed felony theft. The jury assessed $5,327.11 in compensatory damages (imposed jointly and severally by the trial-court judgment) plus exemplary damages of $250,000 against Bennett and $1 million against the Corporation. The court of appeals affirmed.[12]

## II. Discussion

Bennett and the Corporation attack the $1.25 million in exemplary damages on two grounds:

1. The award "is unwarranted under Texas law and exceeds constitutional bounds"; and

2. "Liability for punitive damages cannot be imputed to the Corporation."

## A. Whether the Exemplary Damages are Statutorily Unwarranted and Constitutionally Excessive

Bennett and Bonham Corporation lodge both statutory and constitutional objections. First, they assert the court of appeals "grossly contorted" and "dangerously expanded" the statutory predicate for exemplary damages (malice) in a way that invites such damages in all cases of intentional misconduct. Alternatively, they argue the award flouts the Supreme Court's due-process framework in several respects.

### 1. The Statutory Predicate of Malice

Bennett contends the evidence was legally insufficient to support a finding of malice. Chapter 41 of the Civil Practice and Remedies Code permits exemplary damages where the plaintiff proves by clear and convincing evidence that harm resulted from "malice." In the version of Chapter 41 applicable here, malice covers intentional torts and gross negligence.[13]

---

**12.** 242 S.W.3d at 907.

**13.** The applicable version of Section 41.003(a) made exemplary damages available if "the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from ... malice...." Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110. Section 41.001(7) defined malice as

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Id.* at 109. The current version of Chapter 41 retains these requirements, although Section 41.003 now provides that exemplary damages are available in cases of "malice" and "gross negligence." "Malice" covers intentional torts where, under Section 41.001(7), there is "a specific intent by the defendant to cause substantial injury or harm to the claimant," essentially the same definition found in subpart (A) of the earlier version of Section 41.001(7) quoted above. "Gross negligence" is now defined in Section 41.001(11), using the same language found in subpart (B) of the earlier version of Section 41.001(7) quoted above. *See Dillard Dep't Stores, Inc. v. Silva,* 148 S.W.3d 370, 373 (Tex.2004) (describing subpart (B) of the earlier version of Section 41.001(7) as "an alternative gross negligence component" of malice).

As to intentional torts, malice denotes "a specific intent by the defendant to cause substantial injury to the claimant."[14]

Bennett argues no evidence of malice exists because he "merely sold some cattle that were not his." He says intentionally selling another's stray livestock as one's own and pocketing the proceeds falls short of malice. Here, the jury charge properly defined malice to include "a specific intent by Defendant Bennett to cause substantial injury to Plaintiff." The jury heard testimony that Bennett ordered the sale of Reynolds's cattle despite being warned when they were penned and loaded that they belonged to someone else. The jury could have reasonably formed a firm belief or conviction,[15] from the theft itself and from the ongoing hostilities between the parties, that there was nothing accidental about Bennett's conduct and that he specifically intended to injure Reynolds by taking his property. Bennett concedes in this Court that "there is legally sufficient evidence that the cattle were Reynolds's and Bennett knew it." This record, viewed in the light most favorable to the jury's finding of malice, amply demonstrates Bennett's awareness and intent to convert Reynolds's cattle and then cover his tracks; such evidence implies willfulness, not inadvertence or an honest mistake.

This is a money-damages case, and certainly cases involving death, physical injury, or financial ruin might warrant "greater punishment"[16] than cases lacking such harms. However, exemplary damages are not reserved solely for cases that inflict ruinous physical or fiscal calamity.

Further, there was legally sufficient evidence that Bennett intended to cause "substantial" injury to Reynolds. Under the Penal Code, the theft of thirteen head of cattle constitutes a third-degree felony,[17] punishable by a fine of up to $10,000 and up to a decade behind bars.[18] While the criminal jury acquitted Bennett, the civil jury found his actions constituted cattle theft, thus triggering the felony exception to the exemplary-damages cap.[19] Texas law, both civil and criminal, thus reflects the Legislature's policy judgment that stealing cattle inflicts substantial harm and merits harsh punishment. Moreover, the loss of livestock with a market value exceeding $5,000 was not trivial or de minimis to Reynolds. Bennett concedes in his opening brief that the market value of the stolen cattle "is not nominal," and in his reply brief that "it is certainly clear that the compensatory damages award of $5,327.11 here is *not* small." We have recognized that the term " 'substantial' has two basic components: real vs. merely perceived, and significant vs. trivial."[20] The injury here was both real and significant.

14. Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, sec. 41.001(7)(A), 1995 Tex. Gen. Laws 108, 109.

15. *See Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 609 (Tex.2004) ("[I]n reviewing the legal sufficiency of evidence to support a finding that must be proved by clear and convincing evidence, an appellate court must 'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.' " (quot-

ing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002))).

16. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex.2006).

17. *See* TEX. PEN.CODE § 31.03(e)(5)(A).

18. *See id.* § 12.34.

19. TEX. CIV. PRAC. & REM.CODE § 41.008(c)(13).

20. *Barr v. City of Sinton*, 295 S.W.3d 287, 301 (Tex.2009).

## 2. Constitutional Due–Process Limits

Bennett and Bonham next argue the award is unconstitutionally excessive because it violates due-process constraints. For many years, the United States Supreme Court has reined in awards it deems excessive. In 1989, the Court rejected the argument that the Excessive Fines Clause of the Eighth Amendment limits exemplary damages,[21] but reserved for "another day" whether "the Due Process Clause places outer limits on the size of a civil damages award."[22] That day arrived two years later when the Court identified such limits and held that boundless discretion "may invite extreme results that jar one's constitutional sensibilities."[23] Conceding it could not formulate "a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable,"[24] the Court upheld a 4:1 ratio of exemplary-to-actual damages, but admonished that 4:1 "may be close to the line . . . . of constitutional impropriety."[25]

In the intervening two decades, the Court has steadily restricted exemplary damages and tightened the due-process standards by which courts assess them.

The prevailing principle is that a "grossly excessive" award offends due process because it "furthers no legitimate purpose and constitutes an arbitrary deprivation of property."[26]

The first case to invalidate an award of exemplary damages on due-process grounds was the landmark 1996 decision *BMW of North America, Inc. v. Gore*,[27] a case involving BMW's concealment of pre-delivery damage to new vehicles. *Gore* introduced a three-part framework to "illuminate the character of the standard that will identify unconstitutionally excessive awards."[28] The Court refined the *Gore* guideposts in *State Farm Mutual Automobile Insurance Co. v. Campbell:*

1. "the degree of reprehensibility of the defendant's conduct";

2. "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award"; and

3. "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."[29]

---

**21.** *Browning–Ferris Indus. of Vt. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). Many academics argue the Excessive Fines Clause *should* apply, *see, e.g.*, Stephen R. McAllister, *A Pragmatic Approach to the Eighth Amendment and Punitive Damages*, 43 U. KAN. L.REV. 761 (1995), particularly given the "quasi-criminal" nature of exemplary damages, *see, e.g.*, John Calvin Jeffries, Jr., *A Comment on the Constitutionality of Punitive Damages*, 72 VA. L.REV. 139, 151 (1986); Michael I. Krauss, *Punitive Damages and the Supreme Court: A Tragedy in Five Acts*, 2007 CATO SUP CT. REV. 315, 323 (contending exemplary awards "cross the line to become public ordering and are therefore excessive fines").

**22.** *Browning–Ferris*, 492 U.S. at 276–77, 109 S.Ct. 2909.

**23.** *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

**24.** *Id.*

**25.** *Id.* at 23–24, 111 S.Ct. 1032.

**26.** *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

**27.** 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

**28.** *Id.* at 568, 116 S.Ct. 1589 (internal quotation marks omitted); *see also id.* at 575, 580, 583, 116 S.Ct. 1589.

**29.** *State Farm*, 538 U.S. at 418, 123 S.Ct. 1513.

### a. Reprehensibility

*Gore* described this first guidepost, focused on the "enormity" of the misconduct, as "the most important indicium of the reasonableness of a punitive damages award." [30] Elaborating, the Court has urged consideration of five nonexclusive factors—whether:

1. the harm inflicted was physical rather than economic;

2. the tortious conduct showed "an indifference to or a reckless disregard for the health or safety of others";

3. "the target of the conduct had financial vulnerability";

4. "the conduct involved repeated actions," not just "an isolated incident"; and

5. the harm resulted from "intentional malice, trickery, or deceit," as opposed to "mere accident." [31]

█ One factor alone "may not be sufficient to sustain a punitive damages award, and the absence of all of them renders any award suspect." [32] And though we must presume that "a plaintiff has been made whole for his injuries by compensatory damages," [33] exemplary damages are permitted if the wrongdoing "is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." [34]

█ This case poses a critical threshold matter: whether Bennett's actions beyond the conversion itself may factor into the reprehensibility analysis. Reynolds paints a picture of unalloyed Bennett corruption, alleging a "scheme of deception" aimed at tainting both the civil and criminal trials:

"attempting to bring false charges against Reynolds, threatening physical harm to a witness, attempting to bribe witnesses, and encouraging witnesses to lie about the round up and sale of Reynolds's cattle." The theft "should not be examined in a vacuum," says Reynolds, nor should the Court divorce the underlying tort from the overall "criminal escapade," conduct that Reynolds likens to outright legal thuggery.

Bennett disputes *any* exemplary-damages liability, saying his misdeed "inflicted solely economic harm, for which compensatory damages were awarded" and that no other reprehensibility factor is present. His conversion may have been intentional rather than inadvertent, Bennett says, but it was not malicious. As for the alleged efforts to conceal his wrongdoing, Bennett says dissimilar misconduct separate and apart from the conversion itself has no role in the punitives analysis; only the isolated act of selling the cattle matters. He argues that so-called concealment evidence, to support exemplary damages, must go to the harm inflicted by the underlying malfeasance. Bennett asserts a disconnect here, contending the award was premised on conduct external to what the jury was empaneled to decide and involving people not before the jury.

The Supreme Court has offered limited guidance as to the range of the defendant's conduct that should be considered in evaluating reprehensibility. In *State Farm*, the Court held that exemplary damages cannot be wielded "to punish and deter conduct that bore no relation to the [plaintiff's]

---

30. *Gore*, 517 U.S. at 575, 116 S.Ct. 1589.

31. *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513; *see also Gore*, 517 U.S. at 576–77, 116 S.Ct. 1589.

32. *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513.

33. *Id.*

34. *Id.*

harm." [35]   That is, reprehensibility analysis "does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance." [36]   On the other hand, the Court made clear that related conduct "may be probative when it demonstrates the deliberateness and culpability of the defendant's action," provided that the conduct bears "a nexus to the specific harm suffered by the plaintiff." [37] Obviously, a tortfeasor's attempts to cover his tracks and escape responsibility can imply willfulness.   In addition, the Supreme Court in *Gore* suggested it may be proper to consider wrongdoing of the type Reynolds alleges, noting "the record . . . discloses no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive. . . ." [38]

We align generally with Reynolds that Bennett's alleged extra-conversion misdeeds (at least most of them) count properly toward reprehensibility, as they relate back to the underlying theft and sought to extend and exacerbate harm to Reynolds. We recognize as a general matter that exemplary damages are not meant to redress wrongdoing that *occurs* in litigation, but to redress wrongdoing that *results* in litigation.   They should center on the unsavoriness of the acts, not the actor.   That said, while Bennett's alleged "scheme of deception" is not why he was sued, much of it is interlaced with the theft itself and thus aimed to worsen the damage inflicted on Reynolds.

The Court's openness to surrounding conduct is consistent with the approach taken in the Second Restatement of Torts:

In determining the amount of punitive damages, as well as in deciding whether they should be given at all, the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer, the relations between the parties and the provocation or want of provocation for the act.[39]

A reprehensibility analysis can therefore consider, to some extent, surrounding circumstances beyond the underlying tort. Some of Bennett's furtive actions may go to motive, underscore the parties' animosity, shed light on provocation, demonstrate deliberateness and culpability, and otherwise show heightened reprehensibility.   In short, most of Bennett's non-theft wrongdoing, while perhaps separately redressable via court-ordered sanctions or other legal proceedings, is sufficiently entwined with the theft to enter the exemplary-damages calculus.   However, this other malfeasance, however related, does not transform this conversion claim into one that warrants a double- or triple-digit ratio.

Against that backdrop, we determine that the following allegations may properly inform the reprehensibility analysis:

*Bribing A Witness and Urging Him to Lie.* Reynolds offered evidence that when Bennett learned that former ranch hand Larry Grant had taken incriminating photographs of the stolen cattle, Bennett urged Grant to lie about what he had seen. Bennett then offered Grant a lucrative job and later some money under the guise of helping Grant's family after a car accident.

35.   *Id.* at 422, 123 S.Ct. 1513.

36.   *Id.* at 424, 123 S.Ct. 1513.

37.   *Id.* at 422, 123 S.Ct. 1513.

38.   *Gore,* 517 U.S. at 579, 116 S.Ct. 1589.

39.   Restatement (Second) of Torts § 908 cmt. e (1979).

*Threatening a Witness.* Reynolds points to testimony that a former Corporation ranch hand attempted to threaten bodily harm to Grant. Allegedly, this former employee tried to call and threaten Grant, but instead reached Grant's brother-in-law, thinking that person was Grant.

The Supreme Court in *State Farm* disapproved of letting juries punish alleged torts against third parties.[40] Though the Court stressed that exemplary damages cannot be used to punish extraneous acts or harm against nonparties, that principle seems inapposite when a physical threat (here a blundered threat that apparently never reached its intended target) aims to hide the complained-of malfeasance and evade responsibility. Moreover, the Court stated in *Philip Morris USA v. Williams* that harm to nonparties may enter the reprehensibility analysis,[41] *but* a jury cannot use exemplary damages to punish a defendant for harming nonparties.[42] However indistinct this distinction might be,[43] it seems sensible that harm inflicted or threatened on third parties can be part of the reprehensibility equation when such harm actually targets the plaintiff and the instant litigation. Here, though, the alleged threat went off course, and the record does not show it was ever communicated to Grant; in reality no one was actually endangered. Nonetheless, while this misdirected threat threatened nobody, it attempted to cover Bennett's tracks and foil efforts—not just by Reynolds but by the legal system itself—to unearth the truth.

*Photograph Tampering.* The evidence at both the civil and criminal trials included some of the photographs taken by ranch hand Grant, who suspected that the trailered cattle were not Bennett's. Reynolds alleges that Bennett doctored some of Grant's photographs to bolster his criminal defense and offered perjured testimony in that trial. Moreover, Reynolds asserted in the civil suit that the photographs had been altered to conceal evidence of Bennett's conversion.

*Litigation Against Grant.* Bennett filed a $50,000 slander suit against ranch hand Grant. Reynolds says these "intimi-

---

**40.** The Court explained:

A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis....

*State Farm,* 538 U.S. at 422–23, 123 S.Ct. 1513.

**41.** 549 U.S. 346, 355, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007). In today's case, the conversion and related conduct inflicted no actual harm on third parties, only alleged potential or theoretical harm, and all redressable in other civil or criminal proceedings.

**42.** *Id.* at 353, 355, 127 S.Ct. 1057.

**43.** Justice Stevens voiced a similar reaction: "This nuance eludes me. When a jury increases a punitive damages award because injuries to third parties enhanced the reprehensibility of the defendant's conduct, the jury is by definition punishing the defendant—directly—for third-party harm." *Id.* at 360, 127 S.Ct. 1057 (Stevens, J., dissenting). *See also* Erwin Chemerinsky, *More Questions About Punitive Damages,* TRIAL, May 2007, at 72, 72 ("Trial judges are likely to struggle for years with formulating jury instructions that simultaneously tell the jury to consider *and* not consider harm to people other than the plaintiffs."); Michael P. Allen, *Of Remedy, Juries, and State Regulation of Punitive Damages: The Significance of* Philip Morris v. Williams, 63 N.Y.U. ANN. SURV. AM. L. 343, 359 (2008) ("I have read this passage scores of times.... How can the jury consider conduct toward others to determine reprehensibility but not to punish the defendant?").

dation techniques" showed "that Bennett intended to inflict as much financial pain on Grant as possible." Here, too, the jury could reasonably have deemed this slander suit, though filed against Grant, part of a pattern of intentional malice, trickery, and deceit to cover up Bennett's wrongdoing and subvert Reynolds's lawsuit.

*Meddling With Reynolds's Brand.* The County and District Clerk of San Saba County testified that Bennett once attempted to register Reynolds's brand as his own. This cover-up evidence shows "deliberateness and culpability" and can enhance exemplary damages given its "nexus to the specific harm suffered by the plaintiff." [44] We have previously held that certain cover-up efforts can show reprehensibility, as when a manufacturer of asbestos-containing products continues selling what it knows is dangerous.[45]

At heart, though, this is an economic-injury, actual-harm case seeking recovery for the conversion of thirteen head of cattle. Reynolds alleges a broader "criminal escapade" that aimed to ruin him, but the theoretical possibilities of greater harm strike us as marginally relevant at best in assessing exemplary damages, absent proof of the likelihood of such harms. Bennett's tort was not part of a wider plan to steal Reynolds's entire herd or to bankrupt him. Nor is there evidence that Bennett was a recidivist cattle thief rather than a first-time offender.[46] This lawsuit has a narrower focus, and the jury's findings focus on conversion.

Summing up, Reynolds's evidence of a malicious cattle theft and various furtive acts to conceal it satisfies one of the five *State Farm* reprehensibility factors: the harm resulted from intentional malice, trickery, or deceit. As discussed below, the other factors are essentially absent, and there is no other justification for $1.25 million in exemplary damages. Accordingly, the Supreme Court's ratio analysis must be assiduously followed.

### b. Ratio Between Exemplary and Compensatory Damages

In *State Farm,* the Court "decline[d] again to impose a bright-line ratio" of exemplary to actual damages, but stated that "in practice, few awards exceeding a single-digit ratio ... will satisfy due process" and that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." [47]

Drawing on *State Farm* and other authority, we held, in *Tony Gullo Motors I, L.P. v. Chapa,*[48] that a ratio of 4.33 to 1 exceeded constitutional limits where only the fifth of the five reprehensibility factors favored exemplary damages. In that case, the plaintiff claimed that an automobile dealer had committed fraud by promising to deliver a certain model and delivering instead a less-luxurious model. The dealer's bait-and-switch included various deceptions, including forged signatures of the plaintiff and her deceased husband. The jury awarded economic damages of $7,213, the difference in the values of the two

---

44. *State Farm,* 538 U.S. at 422, 123 S.Ct. 1513.

45. *See Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 46 (Tex.1998).

46. *See Gore,* 517 U.S. at 577, 116 S.Ct. 1589; *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 309 & n. 48 (Tex.2006).

47. 538 U.S. at 425, 123 S.Ct. 1513. The Court derived a 4:1 ratio from the 700–year–long Anglo–American tradition of lawmakers imposing "double, treble, or quadruple damages to deter and punish." *Id.*

48. 212 S.W.3d 299 (Tex.2006).

models, and mental-anguish damages of $21,639 (three times economic damages). Considering the first four reprehensibility factors, we concluded that the defendant's conduct did not cause physical harm, did not threaten the health or safety of others, did not involve repeated actions, and did not threaten financial ruin.[49] Only the fifth factor favored exemplary damages because the conduct was deceitful rather than accidental.[50] We then stressed *State Farm's* admonition that any ratio above 4:1 "might be close to the line of constitutional impropriety."[51] Noting that a 4.33 multiplier "at least pushes against, if not exceeds, the constitutional limits,"[52] we ultimately held:

> Pushing exemplary damages to the absolute constitutional limit in a case like this leaves no room for greater punishment in cases involving death, grievous physical injury, financial ruin, or actions

that endanger a large segment of the public. On this record, Gullo Motors' conduct merited exemplary damages, but the amount assessed by the court of appeals exceeds constitutional limits.[53]

In short, 4.33 times actual damages was constitutionally excessive.

The facts of today's case are not meaningfully distinguishable from those in *Gullo Motors*. Under the first four reprehensibility factors, as interpreted in *Gullo Motors*, Bennett's conduct did not cause physical harm, did not endanger the health or safety of others,[54] did not involve repeated actions,[55] and did not threaten financial ruin. Only the fifth factor favors exemplary damages, in that Bennett's conduct was the result of intentional malice rather than mere accident. We are bound by *Gullo Motors* and accordingly hold that both ratios in this case were excessive.

**49.** *Id.* at 308.

**50.** *Id.*

**51.** *Id.* (quoting *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513).

**52.** *Id.* at 309.

**53.** *Id.* at 310 (footnote omitted).

**54.** As noted above, there was testimony about a single incident where one of Bennett's employees attempted to threaten Larry Grant. However, the phone call was made to the wrong number, reaching Grant's brother-in-law instead. The employee, Don Rogers, flatly denied ever threatening Grant. The brother-in-law, Mack Maxcey, either did not take the call seriously or was not intimidated, telling Rogers to "quit talking and start the bodily harm." Reynolds points to no proof that the misdirected threat was ever communicated to Grant himself or, if so, that Grant took it seriously, or that Rogers seriously intended to carry out the threat. In short, this incident concerns a single alleged phone call threat from a Bennett employee that (1) the employee vigorously denied ever making, (2) was

botched in that it was made to the wrong person, (3) was apparently discounted by the person who received the call, and (4) apparently never reached Grant, the intended target. This evidence does not meaningfully implicate the second reprehensibility factor— that the defendant's conduct showed indifference to or reckless disregard for the health or safety of others.

**55.** As described above, Reynolds complains of a course of conduct, but the only harm for which he sued and recovered damages was the single act of conversion of his cattle. Similarly, the plaintiff in *Gullo Motors* complained of a course of conduct by the defendant that included forging documents, a failure to install promised items, and various representations by and confrontations with the defendant's agents, *see* 212 S.W.3d at 316–17 (O'Neill, J., dissenting), but we nevertheless held that the conduct "did not involve repeated acts," *id.* at 308, because that factor "refers to recidivism," *id.* at 309. The alleged course of conduct in today's case resulted in a single economic loss to Reynolds and under *Gullo Motors* it did not involve repeated, recidivist acts under the fourth reprehensibility factor.

However, we pause to note that rigid application of a 4:1 ratio is not universally required. *State Farm* recognized that "ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'"[56] Reynolds insists this case fits that upward-departure exception. The court of appeals agreed, acknowledging "these ratios appear superficially dramatic,"[57] but concluding this was a case where especially abhorrent conduct inflicted only modest economic harm.[58] We disagree.

As discussed above with respect to the statutory malice requirement, the economic damages of $5,327.11 were substantial and cannot fairly be characterized as nominal or trivial. Reynolds cannot successfully argue that actual damages were substantial for state statutory purposes (thus allowing exemplary damages) but were insubstantial for federal constitutional purposes (thus allowing *large* exemplary damages). Though dwarfed by the punitive damages, $5,327.11 is not trivial; it is the amount the jury believed would redress the concrete loss that Reynolds suffered.

Even assuming that $5,327.11 is "small," the other part of the exception—"a particularly egregious act"[59]—is absent here just as in *Gore*, where the Court rejected $2 million in exemplary damages on $4,000 in actual damages. We cannot characterize the conversion here as qualitatively or quantitatively more egregious that the fraud in *Gullo Motors*. By one objective measure, Bennett's misconduct was *less* egregious: Reynolds sought no damages for mental anguish, unlike the plaintiff in *Gullo Motors*, whose mental-anguish damages were three times her economic damages. The only actual harm Reynolds pled and proved were economic damages.

If courts fail to diligently police the "particularly egregious" exception, they insulate from due-process review precisely those cases where judicial review matters most: those involving unsympathetic defendants where juries are most likely to grant arbitrary and excessive awards.[60] Allowing a freewheeling reprehensibility exception would subvert the constraining power of the ratio guidepost.

The Fifth Circuit has twice upheld triple-digit ratios post-*State Farm*: (1) 110:1 in a housing-discrimination case where compensatory damages were only $500;[61] and (2) 150:1 in a civil-rights case where nominal damages were only $100.[62] Both cases are distinguishable. The former turned on two key facts not present here: (1) there were "inherently low or hard-to-determine actual injuries"[63] (*Gore's* other upward-departure exception),[64] and, (2) there was a $55,000 statutory maximum civil penalty for a comparable first-time

---

**56.** *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513 (quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589).

**57.** 242 S.W.3d at 904.

**58.** *Id.* ("This is such a case.").

**59.** *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513 (quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589).

**60.** *See Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 50 n. 14, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979) ("[I]t cannot be ignored that puni-

tive damages may be employed to punish unpopular defendants.").

**61.** *Lincoln v. Case*, 340 F.3d 283, 287, 294–95 (5th Cir.2003) (remitting the jury's $100,000 exemplary-damages award to $55,000).

**62.** *Williams v. Kaufman County*, 343 F.3d 689, 711 & n. 75 (5th Cir.2003) (affirming exemplary damages of $15,000).

**63.** *Lincoln*, 340 F.3d at 293.

**64.** *Gore*, 517 U.S. at 582, 116 S.Ct. 1589.

offense, which the court held "offers the appropriate award on this record." [65] The latter case is also inapposite given its civil-rights nature: "Because actions seeking vindication of constitutional rights are more likely to result only in nominal damages, strict proportionality would defeat the ability to award punitive damages at all." [66]

In sum, Bennett's wrongdoing is blameworthy enough to warrant exemplary damages, but under federal law "a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives." [67] We commend the court of appeals' careful and extensive analysis, but we disagree that this case falls within the Gore/State Farm exception that leaves room for a higher multiplier.[68] Following our analysis in Gullo Motors,

the exemplary damages here were unconstitutionally excessive. As "the amount of a suggested remittitur is in the first instance a matter for the courts of appeals," [69] we remand to that court.

### c. Legislative Penalties for Similar Misconduct

The final guidepost compares the exemplary damages with legislatively authorized civil sanctions.[70] In this case we need not discuss the "comparable sanctions" guidepost at all, as unconstitutional excessiveness is aptly demonstrated under the ratio guidepost above.[71] But we add this brief word.

■ This factor fortifies the notion that legislatures make policy and are well positioned to define and deter undesired behavior. Accordingly, reviewing courts

---

65. *Lincoln*, 340 F.3d at 294.

66. *Williams*, 343 F.3d at 711.

67. *State Farm*, 538 U.S. at 419–20, 123 S.Ct. 1513.

68. Today's case is also qualitatively different from a notable case that upheld a 37:1 ratio based on "particularly reprehensible" conduct. In *Mathias v. Accor Economy Lodging, Inc.*, Judge Posner wrote for the Seventh Circuit in affirming $186,000 in punitive damages, more than 37 times the $5,000 actual damages. 347 F.3d 672 (7th Cir.2003). A brother and sister were bitten by bedbugs while staying at a downtown Chicago hotel. The hotel had known about the bedbug infestation for years, rejected a $500 bid to exterminate, and told desk clerks to pass off the bedbugs as ticks. The jury found the hotel's conduct "willful and wanton," and the court of appeals deemed it "outrageous," saying the infestation reached "farcical proportions" and that infested rooms were rented nightly to unsuspecting customers despite being on "Do not rent, bugs in room" status. *Id.* at 674–75, 677. As Judge Posner noted, it was probably no coincidence that the $191,000 total award per plaintiff amounted to $1,000 for each of the hotel's 191 rooms. *Id.* at 678.

This bedbug case differs significantly from today's cattle case. The bedbugs preyed on unwary guests nightly, leaving them with painful and unsightly red welts and bites—all told, countless health-endangering episodes that could have ended years earlier with a quick $500 extermination. The hotel recklessly disregarded and lied about a known health risk, deliberately exposing its guests to an insect infestation, conduct that "amounted to fraud and probably to battery as well." *Id.* at 675.

69. *Gullo Motors*, 212 S.W.3d at 310.

70. *State Farm*, 538 U.S. at 418, 123 S.Ct. 1513.

71. Many courts exclude the "comparable sanctions" factor altogether once they conclude the ratio violated due process. *E.g.*, *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 408 (5th Cir.2000) ("Having found that the award fails to satisfy the second requirement, we need not examine the third prong of the *BMW* test."); *Borne v. Haverhill Golf & Country Club, Inc.*, 58 Mass. App.Ct. 306, 791 N.E.2d 903, 916–17 (2003) (considering only the first and second guideposts); *McClain v. Metabolife Int'l, Inc.*, 259 F.Supp.2d 1225 (N.D.Ala.2003) (ignoring comparable sanctions).

"should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." [72] In cases where applicable civil penalties exist, this guidepost gives bad actors fair notice of what is forbidden and of potential penalties. Today's case, however, is not ordinary, given the absence of civil penalties and the presence of criminal ones. The two are incommensurate, and incarceration does not translate meaningfully to a dollar-figure fine. [73]

The court of appeals looked to both civil and criminal statutes. On the criminal side, it noted the Penal Code provisions on third-degree felony theft (punishable by two to ten years imprisonment) [74] and witness tampering (punishable by six months to two years). [75] The Supreme Court in *Haslip* and *Gore* "also looked to criminal penalties that could be imposed," [76] since "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action." [77] But in *State Farm* the Court added this

caution: "When used to determine the dollar amount of the award, however, the criminal penalty has less utility." [78] The Court explained that "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." [79] *State Farm* reflects the Court's evolving view of exemplary damages and stresses the limited usefulness of criminal penalties, but notably *State Farm* and *Gore* mention that legislative sanctions often take the form of double, treble, or quadruple damages. [80]

Here, the criminal jury acquitted Bennett of cattle theft, but the civil jury found that he and the Corporation did "commit theft of 10 or more head of cattle during a single transaction and ... the aggregate value of those cattle [was] less than $100,000.00." This finding tracks (1) the then-applicable Penal Code definition of third-degree felony theft, [81] which aside from a possible decade-long incarceration permits a fine "not to exceed $10,000," [82]

72. *Gore*, 517 U.S. at 583, 116 S.Ct. 1589 (internal quotation marks omitted).

73. Some commentators argue that comparing economic sanctions with jail time "would effectively eviscerate" the guidepost altogether because "[a]ny nontrivial potential term of imprisonment would likely justify almost any size punitive damages awards." Steven L. Chanenson & John Y. Gotanda, *The Foggy Road for Evaluating Punitive Damages: Lifting the Haze from the* Gore/State Farm *Guideposts*, 37 U. Mich. J.L. Reform 441, 479–80 (2004).

74. 242 S.W.3d at 906 (citing Tex. Pen Code §§ 31.03(e)(5)(A) and 12.34).

75. *Id.* (citing Tex. Pen.Code §§ 36.05 and 12.35).

76. *State Farm*, 538 U.S. at 428, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 583, 116 S.Ct. 1589, and *Haslip*, 499 U.S. at 23, 111 S.Ct. 1032).

77. *Id.*

78. *Id.*

79. *Id.*

80. *See State Farm*, 538 U.S. at 425, 123 S.Ct. 1513; *Gore*, 517 U.S. at 581 & n. 33, 116 S.Ct. 1589.

81. *See supra* note 11.

82. Tex. Pen.Code § 12.34(b). Interestingly, stealing 100 head of cattle (or theoretically, even 1,000) is criminally no riskier than stealing ten so long as the value remains less than $100,000. And while incarceration ratchets up for higher-grade felonies involving higher-dollar losses, the maximum fine for first- and second-degree felonies remains $10,000. *Id.* §§ 12.32–.33. Also, outside the context of cattle and certain other animals, third-degree felony theft only applies to property worth at least $20,000. *Id.* § 31.03(e)(5). If stolen cattle were treated like other stolen property,

and (2) the felony theft exception to the statutory cap on exemplary damages.[83]

On the civil side, the court of appeals emphasized

> the Texas Legislature's policy choice to exempt conduct constituting third-degree felony theft from the caps otherwise applicable to punitive damages awards.... [B]arring contrary constitutional impediments, the legislature has deemed such conduct so serious as to remove the state statutory limitations otherwise restricting the amount of punitive damage awards for such conduct.[84]

In ordinary civil cases, Section 41.008 of the Civil Practice and Remedies Code caps exemplary damages at an amount not to exceed the greater of (1) $200,000 or (2) noneconomic damages (up to $750,000) plus two times economic damages.[85] However, the Legislature makes this statutory ceiling inapplicable to conduct constituting third-degree (and higher) felony theft, like stealing cattle.

The Legislature inarguably has discretion to deem certain crimes more detestable than others and thus deserving of harsher punishment.[86] But that does not prevent due process from mandating a lower award. As we emphasized in *Gullo Motors*, the Supreme Court requires us to look to civil penalties " 'imposed in *comparable* cases.' " [87] We cannot conclude that the general $200,000 ceiling reflects the Legislature's judgment that this amount, much less a higher uncapped amount, is thus constitutionally permissible. Lifting the $200,000 cap in some cases does not demonstrate constitutional propriety in this case. Indeed, even an award well *below* the statutory ceiling can offend due process.[88]

In sum, the "comparable sanctions" guidepost offers little guidance—there are no on-point civil penalties—though pegging punitives to the $10,000 criminal fine would produce a 1.877 ratio.

### d. The Exemplary–Damages Award Violated Due Process

Our settled practice is not to remit unconstitutional awards ourselves or to prescribe a required ratio, though on this

---

the thief would sometimes face less jail time. For example, if someone converts not cattle worth $5,327.11 but a Remington cattle *sculpture* worth $5,327.11, he would confront not a third-degree felony but a less-serious state jail felony (180 days to two years in state jail), though the same potential $10,000 fine would apply. *Id.* § 12.35. And once the "third-degree" label attaches, stealing $99,999.99 worth of cattle is criminally no worse than stealing $99,999.99 worth of cattle feed.

83. Tex. Civ. Prac. & Rem.Code § 41.008(c)(13).

84. 242 S.W.3d at 906.

85. Tex. Civ. Prac. & Rem.Code § 41.008(b).

86. Two commentators argue that the highest comparable fine should set a presumptive limit on punitive damages. Chanenson & Gotanda, *supra* note 73, at 444. By "setting the statutory maximum fine that fixes the presumptive limit, the relevant legislature has spoken to the misconduct's reprehensibility already." *Id.* at 478. However, capping exemplary damages at the $10,000 maximum fine may seem disproportionately low in certain high-dollar contexts—for example, in a case of first-degree felony theft where the property stolen is worth $200,000 or more. *See* Tex Pen.Code §§ 12.32(b), 31.03(e)(7).

87. *Gullo Motors*, 212 S.W.3d at 309 (quoting *Gore*, 517 U.S. at 575, 116 S.Ct. 1589).

88. *See id.* at 307; *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430 n. 12, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 45 (Tex.1998) ("[E]ven if an assessment of punitive damages is not deemed excessive under governing state law, it may violate a party's substantive due process right to protection from 'grossly excessive' punitive damages

record, even 4:1 seems a stretch: "Pushing exemplary damages to the absolute constitutional limit in a case like this leaves no room for greater punishment in cases involving death, grievous physical injury, financial ruin, or actions that endanger a large segment of the public."[89] The award in this case cannot be squared with our on-point *Gullo Motors* decision, another "scheme of deception" case.

The Supreme Court is decidedly hands-on when scrutinizing high-dollar exemplary-damages awards, and we are confident the Court would conclude this award "was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant."[90]

## B. Corporate Liability for Exemplary Damages

■ Bonham Corporation contends it cannot be assessed exemplary damages for Bennett's conduct. We disagree.

Section 41.005(c) of the Civil Practice and Remedies Code addresses the imposition of exemplary damages against a defendant for the criminal act of another. The jury charge tracked this statutory provision, which states:

In an action arising out of a criminal act committed by an employee, the employer may be liable for punitive damages but only if:

(1) the principal authorized the doing and the manner of the act;

(2) the agent was unfit and the principal acted with malice in employing or retaining him;

(3) the agent was employed in a managerial capacity and was acting in the scope of employment; or

(4) the employer or a manager of the employer ratified or approved the act.

The jury imposed exemplary damages against the Corporation but was not asked to specify which subpart of the statute it found applicable. The evidence was legally sufficient to uphold exemplary damages under subpart (1), which imposes liability if "the principal authorized the doing and the manner of the act."

■■ Corporations, of course, "can act only through human agents."[91] Corporate decisions, likewise, are ultimately made by human agents. In deciding whether exemplary damages can be assessed against a corporation, we have focused on the concept of a vice-principal. In *Hammerly Oaks, Inc. v. Edwards*, we explained that acts of a vice-principal are deemed to be acts of the corporation for purposes of exemplary damages because the vice-principal "represents the corporation in its corporate capacity."[92] As we explained in *GTE Southwest, Inc. v. Bruce*:

When actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself. A vice-principal represents the corporation in its corporate capacity, and includes persons who have authority to employ, direct, and discharge servants of the master, and those to whom a master has confided the management of the whole or a department or division of his business.[93]

awards." (quoting *Gore*, 517 U.S. at 568, 116 S.Ct. 1589)).

89. *Gullo Motors*, 212 S.W.3d at 310.

90. *State Farm*, 538 U.S. at 429, 123 S.Ct. 1513.

91. *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 188 (Tex.2007).

92. 958 S.W.2d 387, 391 (Tex.1997).

93. 998 S.W.2d 605, 618 (Tex.1999) (citation omitted).

In *Chrysler Insurance Co. v. Greens-point Dodge of Houston, Inc.,* we further explained that a vice-principal includes four classes of human agents:

> (a) Corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business.[94]

Under these formulations, not only was Bennett indisputably a vice-principal of Bonham Corporation, he was most likely the only vice-principal and the only person whose conduct and decisions could subject the corporation to exemplary damages.

Bennett was the highest corporate officer, the president. Further, he was not a corporate officer in name only. Regarding the Ranch operations, Bennett testified: "I make the decisions," and "I run the ranch." There was no evidence that he had ever received a single order from his daughters, the putative owners, regarding how to conduct Corporation business.

In addition to Bennett's de facto control over Ranch operations, he was formally vested with control over the Corporation. The corporate charter and bylaws gave him broad authority to act as the Corporation, including "such powers and duties as are commonly incident to his office" as "the chief executive officer of the corporation." According to a resolution from a 1991 shareholder meeting, Bennett was:

> authorized to transact business on behalf of the corporation. He shall be fully authorized to sign deeds, notes, deed of trust, mineral deeds, royalty contracts, oil and gas leases, and all other legal papers and documents in the name of and on behalf of the corporation. Also, he shall be entitled to run his personal livestock on any corporate land.

Not only did Bennett direct ranch operations generally, but he used his authority to direct corporate employees, on corporation time, to load Reynolds's cattle and sell them at auction, the specific tortious conduct that led to the assessment of exemplary damages. The cattle were on Corporation-owned land, and Bennett used Corporation-owned trucks to accomplish the conversion. The corporate charter states that its purposes include "development" of the Ranch property. Insofar as Bennett exercised control over the use or development of the property by removing Reynolds's cattle, he was acting in a corporate capacity. Further, Bennett testified that he received no salary from the Corporation to serve as its president, but did receive a lease to run his cattle as payment for his service. Bennett may have personally received the funds from the conversion of Reynolds's cattle, but the receipt of those funds was made possible by Bennett's cattle lease, which in turn was his compensation for serving as Corporation president.

Bennett argues there must be some "nexus between the act and the scope of the agent's duties or the corporation's authorization." Generally, "[w]hen actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself," and "status as a vice-principal of the corporation is sufficient to impute liability to [the corporation] with regard to his actions taken in the workplace." [95] We agree the Corporation cannot be liable for exemplary damages if the vice-principal's misconduct oc-

---

**94.** 297 S.W.3d 248, 250 n. 1 (Tex.2009) (quoting *Hammerly Oaks,* 958 S.W.2d at 391).

**95.** *Bruce,* 998 S.W.2d at 618.

curred while he was acting in a personal capacity unrelated to his authority as a corporate vice-principal. But here, Bennett used corporate authority over corporate employees, on corporate land, to convert cattle using corporate equipment. There is ample evidence that Bennett was acting in a corporate capacity.

Section 41.005(c)(1) permits exemplary damages if the Corporation "authorized the doing and the manner of the act." As a vice-principal acting in a corporate capacity, Bennett inarguably authorized and approved his own act of converting the cattle. The record is devoid of evidence that anyone else could have authorized it. The Corporation, therefore, authorized the doing and manner of the conversion, and Bennett's conduct was chargeable to the Corporation for purposes of exemplary damages.

### III.  Conclusion

Robert Frost wrote elegantly of rural life, and made famous an old proverb: "Good fences make good neighbours," [96] an apt aphorism for Texas cattle ranchers along the drought-prone Colorado River.

The Supreme Court has placed a constitutional fence around exemplary damages, one that lower courts must police to prevent the "acute danger of arbitrary deprivation of property." [97] As the Court counseled almost a century ago, the power to award exemplary damages "is limited by the obligation to administer justice." [98] We concede the constitutional lines are somewhat opaque, making the required balancing "necessarily unscientific." [99] Indeed, the role of exemplary-damages "gatekeeper" has been called "one of the most challenging that has been placed upon appellate judges in civil cases." [100] "[T]ime and again," [101] though, the Supreme Court has disapproved of awards "that dwarf the corresponding compensatories." [102]

We agree with the court of appeals that "Texans know better than to steal cattle," [103] an offense once redressed beneath a tree rather than inside a courtroom. That said, the 47:1 and 188:1 ratios here exceed the outermost limit permitted by due process. We thus remand to the court of appeals to reconsider exemplary damages in line with this opinion and prevailing ratio analysis.

Justice JOHNSON filed a concurring opinion.

Justice LEHRMANN did not participate in the decision.

Justice JOHNSON, concurring.

The jury found that Randy Reynolds suffered actual damages of $5,327.11 for the loss of thirteen cattle. Bennett admittedly intended to sell the cattle, although he maintained they were his and denied

**96.** Robert Frost, *Mending Wall, in* NORTH OF BOSTON 11, 12 (Henry Holt & Co. 1917) (1914).

**97.** *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 n. 10, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994).

**98.** *Standard Oil Co. of Ind. v. Missouri*, 224 U.S. 270, 286, 32 S.Ct. 406, 56 L.Ed. 760 (1912).

**99.** *Williams v. Kaufman County*, 343 F.3d 689, 712 n. 77 (5th Cir.2003).

**100.** *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 450 (3rd Cir.1999).

**101.** *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 475, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting).

**102.** *Exxon Shipping Co. v. Baker*, —— U.S. ——, 128 S.Ct. 2605, 2625, 171 L.Ed.2d 570 (2008).

**103.** 242 S.W.3d at 907.

intending to injure Reynolds, much less to seriously or substantially harm him. The jury found that Bennett's conversion of the cattle was done with malice even though his actions in rounding up and selling them were peaceable, no one was hurt, and no one was threatened when the deed was accomplished. The parties seem to agree that the jury based its $1,250,000 exemplary damages award to a large degree on actions Bennett took separately from his actions in converting the cattle, although Reynolds only claimed, and the jury only awarded, actual damages because of the conversion. As opposed to justifying the exemplary damages by referencing actions showing Bennett intended to cause Reynolds substantial injury by his actions in converting the cattle, Reynolds references actions by Bennett that were not directly related to the conversion as "reprehensible" actions that justify the large award.

As applicable to this case, former section 41.003(a) of the Texas Civil Practice and Remedies Code allows recovery of exemplary damages if "the harm with respect to which the claimant seeks recovery of exemplary damages results from" malice. Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110. The trial court charged the jury to find whether "the harm to [Reynolds] resulted from malice by Defendant Bennett," and defined "malice" according to the statute as:

(a) a specific intent by Defendant Bennett to cause substantial injury to Plaintiff; or

(b) an act or omission by Defendant Bennett;

   (i) which, when viewed objectively from the standpoint of Defendant Bennett at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

   (ii) of which Defendant Bennett had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

Evidentiary support for a finding of malice under subpart (a) of the definition must be by evidence that the harm to Reynolds— the conversion of his cattle—resulted from a specific intent by Bennett to cause Reynolds not just injury, but *substantial* injury. A finding of malice under subpart (b) of the definition, which corresponds to the definition of gross negligence, requires evidence that Bennett's actions were likely to cause "serious injury" to Reynolds. *See Smith v. O'Donnell*, 288 S.W.3d 417, 423 (Tex.2009) (" 'Extreme risk' is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff."); *Universal Servs. Co., Inc. v. Ung*, 904 S.W.2d 638, 641 (Tex.1995) ("Objectively, the defendant's conduct must create 'an extreme degree of risk.' ... [T]he defendant's conduct must create the 'likelihood of serious injury' to the plaintiff."); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex.1994) ("Only if the defendant's act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent.").

For two reasons, I address only part (a) of the jury charge that defined malice as a specific intent to cause substantial injury to the plaintiff. First, the Court addresses only that part of the malice definition. Second, it is not clear that part (b) of the definition even applies in intentional tort cases. *See Dillard Dep't Stores, Inc. v. Silva*, 148 S.W.3d 370, 373 (Tex.2004) (noting that a question exists about whether

subsection (b) of the malice definition applies in an intentional tort setting).[1]

The Court cites *Barr v. City of Sinton*, 295 S.W.3d 287, 301 (Tex.2009) for the proposition that the term "substantial" has two basic components: real vs. perceived and significant vs. trivial. 315 S.W.3d at 872. In *Barr*, the Court was construing the Texas Religious Freedom Restoration Act (TRFRA) that provides a governmental entity may not "substantially burden a person's free exercise of religion [unless it] demonstrates that the application of the burden to the person ... is in furtherance of a compelling governmental interest [and] is the least restrictive means of furthering that interest." 295 S.W.3d at 289. The Court noted that the terms "substantially" and "substantial" were not defined in the TRFRA, nor were they seemingly defined elsewhere in Texas statutes. *Id.* at 301. Referencing the ordinary meaning of "substantial" as found in Webster's Third International Dictionary, the Court noted the two basic components of "substantial." The Court also noted that as defined, the "real vs. merely perceived, and significant vs. trivial" limitations "leave a broad range of things covered." *Id.* The Court declined to craft a bright-line rule to apply in every context to determine when a person's free exercise of religion has been substantially burdened; rather, the Court concluded that each case requires a fact-specific inquiry and the question of substantial burden is to be determined from the perspective of the person whose exercise of religion is in question. *Id.* at 301–02.

As to whether Bennett's intent was to cause "substantial" injury, it seems appropriate for the analysis to be similar to the analysis applied in *Barr*. The determina-tion should not be according to a bright-line rule, but should be focused on and entail a fact-specific analysis of Bennett's knowledge and intent in regard to Reynolds's situation at the time of the conversion. For example, stealing cattle has traditionally been considered a serious matter in Texas. It might be classified as a substantial, significant injury without further analysis, especially in light of the fact that it is a criminal offense. *See* TEX. PENAL CODE § 31.03(e)(5)(A). But in considering the statutory definition of malice, it is hard to see how Bennett could have specifically intended to cause Reynolds substantial injury if, for example, Reynolds owned, or if Bennett believed Reynolds owned, a thousand cattle at the time Bennett converted thirteen of them. On the other hand, if (1) Reynolds owned only twenty cattle, (2) those cattle comprised a large part of Reynolds's net worth, and (3) Bennett knew it when he converted thirteen head of them, it would be easier to infer that Bennett specifically intended to cause substantial injury to Reynolds.

As to the magnitude of the injury Bennett intended to cause and the jury's finding that he converted the cattle with malice, two evidentiary factors stand out and in my view comprise legally sufficient evidence that Bennett had a specific intent to cause Reynolds substantial injury by converting his cattle. First, as the Court notes, under the Penal Code, the theft of thirteen cattle is a third degree felony. *See id.* While Bennett was not convicted for theft of the cattle, the penal provision nevertheless reflects the seriousness of taking thirteen head of cattle that belong to someone else. That weighs more in favor of the conversion being a significant injury than the conversion being a lesser

---

1. As the Court notes, Chapter 41 has been amended and now distinguishes between "malice" and "gross negligence." 315 S.W.3d 871 n. 13; *see* TEX. CIV. PRAC. & REM CODE §§ 41.001(7), (11), 41.003.

injury. Second, there is evidence that before Bennett converted the cattle he was told by Reynolds that Reynolds could not afford to pay approximately $4,500 as a share of the cost for replacing the fence between the Bonham ranch and the land where Reynolds kept his cattle. Evidence that Reynolds made such a statement about his financial condition supports an inference that Bennett knew the loss of over $5,000 worth of cattle would be a significant injury to Reynolds and that Bennett intended to cause such an injury.

I join the Court's judgment and opinion, except for the analysis as to the legal sufficiency of the evidence to support the jury's finding that Bennett converted Reynolds's cattle with malice. For the reasons expressed above, however, I agree the evidence is legally sufficient to support the finding and concur in the Court's conclusion as to that issue.