# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON REMAND

## NO. 03-05-00034-CV

**Thomas O. Bennett, Jr. and James B. Bonham Corporation, Appellants**

**v.**

**Randy Reynolds, Appellee**

### FROM THE DISTRICT COURT OF SAN SABA COUNTY, 33rd JUDICIAL DISTRICT
### NO. 8027, HONORABLE V. MURRAY JORDAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this proceeding following remand from the Texas Supreme Court, we reconsider the amounts of exemplary damages that due process will permit on this record. The underlying facts and procedural history are detailed in this Court's prior opinion, 242 S.W.3d 866, and that of the supreme court. 315 S.W.3d 867. A jury found appellants Thomas O. Bennett, Jr. and James B. Bonham Corporation jointly and severally liable for conversion of cattle belonging to Randy Reynolds and awarded Reynolds $5,327.11 in actual damages, plus exemplary damages of $250,000 from Bennett and $1 million from Bonham Corporation. The district court rendered judgment based on the jury's findings. Bennett and Bonham Corporation each appealed to this Court, challenging, among other things, whether the evidence was legally or factually sufficient to

support the actual damage awards or the malice findings that were the predicate for exemplary damages, whether the size of the exemplary damages awards exceeded due-process limitations, and whether Bonham Corporation could be held liable for actual or exemplary damages based on acts by Bennett. 242 S.W.3d at 876. We affirmed the district court's judgment in full. *Id.* at 876-907. Bennett and Bonham Corporation then appealed to the Texas Supreme Court, challenging the exemplary damages awards on the grounds that (1) there was legally insufficient evidence of malice; (2) any acts by Bennett that were the basis for exemplary damages could not be imputed to Bonham Corporation; and (3) the awards exceeded due-process limitations. The supreme court affirmed this Court with respect to the predicate malice finding and Bonham Corporation's liability for exemplary damages, *see* 315 S.W.3d at 871-72, but held that the size of the awards exceeded the outermost limits of due process. *See id.* at 873-83. The supreme court remanded the cause to us with instructions to "reconsider exemplary damages in line with this opinion and prevailing ratio analysis." *Id.* at 885.

We have done so, and conclude that due process permits an exemplary damages award against Bennett and Bonham Corporation of not more than $10,000 each.

## THE SUPREME COURT'S OPINION AND PREVAILING RATIO ANALYSIS

Three factors guide courts in determining whether an exemplary damages award exceeds the bounds of due process: (1) the degree of "reprehensibility" of the defendant's conduct; (2) the disparity or ratio between the actual or potential harm suffered by the plaintiff and the exemplary damages award; and (3) the difference between the exemplary damages and the

2

civil penalties authorized or imposed in comparable cases. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

**Reprehensibility**

The first factor, the degree of reprehensibility of the defendant's conduct, is the "most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. The U.S. Supreme Court has cautioned that "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm*, 538 U.S. at 419. Where "a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives," the Supreme Court has further indicated, courts should go no further. *Id.* at 419-20.

Courts evaluate reprehensibility by considering five nonexclusive factors—whether:

1. "the harm caused was physical as opposed to economic;"

2. "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;"

3. "the target of the conduct had financial vulnerability;"

4. "the conduct involved repeated actions or was an isolated incident;"

5. "and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Id.* at 419 (citing *Gore*, 517 U.S. at 576-77). In this case, the supreme court concluded that the reprehensibility inquiry could consider not only Bennett's conversion of the cattle—the underlying

3

tort—but certain other conduct by Bennett that "relate[d] back to the underlying theft and sought to extend and exacerbate harm to Reynolds," because it "may go to motive, underscore the parties' animosity, shed light on provocation, demonstrate deliberateness and culpability, and otherwise show heightened reprehensibility." 315 S.W.3d at 874-75. The court identified the following evidence of alleged extra-conversion acts that "may properly inform the reprehensibility analysis:"

Bribing A Witness and Urging Him to Lie. Reynolds offered evidence that when Bennett learned that former ranch hand Larry Grant had taken incriminating photographs of the stolen cattle, Bennett urged Grant to lie about what he had seen. Bennett then offered Grant a lucrative job and later some money under the guise of helping Grant's family after a car accident.

Threatening a Witness. Reynolds points to testimony that a former Corporation ranch hand attempted to threaten bodily harm to Grant. Allegedly, this former employee tried to call and threaten Grant, but instead reached Grant's brother-in-law, thinking that person was Grant.

. . . it seems sensible that harm inflicted or threatened on third parties can be part of the reprehensibility equation when such harm actually targets the plaintiff and the instant litigation. Here, though, the alleged threat went off course, and the record does not show it was ever communicated to Grant; in reality no one was actually endangered. Nonetheless, while this misdirected threat threatened nobody, it attempted to cover Bennett's tracks and foil efforts—not just by Reynolds but by the legal system itself—to unearth the truth.

Photograph Tampering. The evidence at both the civil and criminal trials included some of the photographs taken by ranch hand Grant, who suspected that the trailered cattle were not Bennett's. Reynolds alleges that Bennett doctored some of Grant's photographs to bolster his criminal defense and offered perjured testimony in that trial. Moreover, Reynolds asserted in the civil suit that the photographs had been altered to conceal evidence of Bennett's conversion.

Litigation Against Grant. Bennett filed a $50,000 slander suit against ranch hand Grant. Reynolds says these "intimidation techniques" showed "that Bennett intended to inflict as much financial pain on Grant as possible." Here, too, the jury could reasonably have deemed this slander suit, though filed against Grant, part of a pattern of intentional malice, trickery, and deceit to cover up Bennett's wrongdoing and subvert Reynolds's lawsuit.

4

<u>Meddling With Reynolds's Brand</u>. The County and District Clerk of San Saba County testified that Bennett once attempted to register Reynolds's brand as his own. This cover-up evidence shows "deliberateness and culpability" and can enhance exemplary damages given its "nexus to the specific harm suffered by the plaintiff." We have previously held that certain cover-up efforts can show reprehensibility, as when a manufacturer of asbestos-containing products continues selling what it knows is dangerous.

*Id.* at 875-77 (footnotes omitted).

On the other hand, the supreme court concluded that "[a]t heart . . . this is an economic-injury, actual-harm case seeking recovery for the conversion of thirteen head of cattle . . . ." *Id.* at 877. It rejected Reynolds's view of "a broader 'criminal escapade' that aimed to ruin him," stating that "the theoretical possibilities of greater harm strike us as marginally relevant at best in assessing exemplary damages, absent proof of the likelihood of such harms." *Id.* The court further reasoned that "Bennett's tort was not part of a wider plan to steal Reynolds's entire herd or to bankrupt him. Nor is there evidence that Bennett was a recidivist cattle thief rather than a first-time offender." *Id.* Instead, according to the supreme court, "[t]his lawsuit has a narrower focus, and the jury's findings focus on conversion." *Id.*

The supreme court concluded that "Reynolds's evidence of a malicious cattle theft and various furtive acts to conceal it satisfies one of the five *State Farm* reprehensibility factors: the harm resulted from intentional malice, trickery, or deceit," but that "the other factors are essentially absent." *Id.*

**Ratio between exemplary and compensatory damages**

The second factor in our due-process analysis considers the disparity between the actual or potential harm suffered by the plaintiff and the exemplary damages award. Although

5

the high courts have not imposed a rigid, bright-line ratio that is to be universally applied, the U.S. Supreme Court nonetheless has stated that "in practice, few awards exceeding a single-digit ratio between punitive damages and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425 (deriving a 4:1 ratio from longstanding Anglo-American tradition of imposing "double, treble, or quadruple damages to deter and punish"). The Texas Supreme Court has similarly observed that "any ratio above 4:1 'might be close to the line of constitutional impropriety.'" 315 S.W.3d at 878 (quoting *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308 (Tex. 2006) (quoting *State Farm*, 538 U.S. at 425)). An award above the 4:1 ratio typically will comport with due process only where a "particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582. Drawing on its analysis of the reprehensibility factor, the Texas Supreme Court held that the facts in this case do not fall within the "particularly egregious" exception so as to warrant an upward departure from the typical 4:1 ratio. 315 S.W.3d at 879-80. To the contrary, in the supreme court's view, the facts of this case "are not meaningfully distinguishable from those in *Gullo Motors*." *Id.* at 878.

In *Gullo Motors*, Nury Chapa claimed that Gullo Motors, a car dealership, had committed fraud by promising to deliver a "Limited" model of Toyota and delivering instead a base model. *Gullo Motors*, 212 S.W.3d at 303. There was evidence of deceitful conduct by the dealership, including adding the VIN of the base model to the sales contract after Chapa had already signed it and forging signatures, *id.* at 305-06, including the signature of Chapa's deceased husband on a delivery form showing acceptance of the vehicle, *id.* at 317 (O'Neill, J., dissenting). When Chapa sought to return the unwanted vehicle for a refund, the dealership refused, stating falsely that the car had already been titled. *Id.* at 306. Additionally, there was evidence that the sales manager

6

had made abusive comments to Chapa, including telling her that "[y]ou are a nobody. It's your word against me, against us," and that he would have the car towed away at her expense. *Id.* at 317 (O'Neill, J., dissenting). Chapa sued Gullo Motors, and a jury awarded her $7,213 in economic damages, $21,639 in mental-anguish damages (corresponding to three times economic damages), plus exemplary damages of $250,000, which the court of appeals reduced to $125,000. *Id.* at 306-07. The $125,000 exemplary damages award was roughly 4.33 times the amount of actual damages. The Texas Supreme Court held that this award violated due process. *Id.* at 310. It reasoned that the dealership's conduct implicated only one of the five reprehensibility factors—"intentional malice, trickery, or deceit, [not] mere accident" and that:

> Pushing exemplary damages to the absolute constitutional limit in a case like this leaves no room for greater punishment in cases involving death, grievous physical injury, financial ruin, or actions that endanger a large segment of the public. On this record, Gullo Motors' conduct merited exemplary damages, but the amount assessed by the court of appeals exceeds constitutional limits.

*Id.*

The Texas Supreme Court concluded that Bennett and Bonham Corporation's conduct was not "qualitatively or quantitatively more egregious" than that of Gullo Motors. 315 S.W.3d at 879. Like Gullo Motors, Bennett and Bonham Corporation had intentionally inflicted economic damage on the plaintiff, but, the court reasoned, their conduct implicated only one of the five reprehensibility factors: it was the result of intentional malice, trickery, or deceit. In light of the perceived similarities between *Gullo Motors* and this case, the Texas Supreme Court held that the exemplary damages awards here, which significantly exceeded a 4.33 ratio, likewise violated due process. *Id.* at 878, 880.

7

**Legislative penalties for similar misconduct**

The third factor in our due-process analysis considers the difference between the exemplary-damages award and the civil penalties legislatively authorized or imposed in comparable cases. *State Farm*, 538 U.S. at 418. Although it observed that "we need not discuss the 'comparable sanctions' guidepost at all, as unconstitutional excessiveness is aptly demonstrated under the ratio guidepost," the Texas Supreme Court nonetheless took pains to add some observations regarding the use of civil or criminal penalties as a guidepost for evaluating the constitutional permissibility of exemplary damages awards. The court emphasized that because "legislatures make policy and are well positioned to define and deter undesired behavior, . . . . reviewing courts 'should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.'" 315 S.W.3d at 880-81 (quoting *Gore*, 517 U.S. at 583). Thus, "[i]n cases where applicable civil penalties exist, this guidepost gives bad actors fair notice of what is forbidden and of potential penalties." *Id.* at 881. However, the supreme court ultimately concluded this guidepost offered "little guidance" because there were no comparable civil penalties. *Id.* at 881, 882.[1]

The supreme court did emphasize, however, that the legislature had imposed criminal penalties for cattle theft and that, in fact, the jury had made a cap-buster finding that Bennett and Bonham Corporation had committed theft of ten or more head of cattle having an aggregate value of less than $100,000, an act that constituted third-degree felony theft. *Id.* at 881-82. Although maintaining that the potential criminal penalty of incarceration "does not translate meaningfully to

---

[1] Nor, the supreme court reasoned, was it instructive that the legislature had exempted certain conduct from the exemplary damages caps of civil practice and remedies code chapter 41. 315 S.W.3d at 882.

a dollar-figure fine," the court did intimate that the criminal fine for such conduct—$10,000—might provide a potential objective basis for setting a constitutionally permissible exemplary damages award. *Id.* at 882 ("pegging punitives to the $10,000 criminal fine would produce a 1.877 ratio").

**CONCLUSION**

On remand, we are left with the task of determining "a more modest punishment" in exemplary damages that would give effect to this State's legitimate interest in deterring and punishing Bennett and Bonham Corporation's reprehensible conduct without being gratuitously excessive and amounting to an arbitrary deprivation of property. *See id.* at 880 (quoting *State Farm*, 538 U.S. at 419-20). The Texas Supreme Court has further indicated that these amounts must be sufficiently beneath the typical 4:1 ratio so as to "leave[] . . . room for greater punishment in cases involving death, grievous physical injury, financial ruin, or actions that endanger a large segment of the public." *Id.* at 878 (quoting *Gullo Motors*, 212 S.W.3d at 310). As for what the precise amounts might be, this Court should not remedy the arbitrariness of excessive exemplary damage awards merely by arbitrarily picking its own numbers out of the air. Objective criteria are essential in evaluating the reasonableness of exemplary damages, *see TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 480-81 (1993) ("Without objective criteria on which to rely, almost any decision regarding proportionality will be a matter of personal preference.") (O'Connor, J., dissenting), and among these are the policy judgments reflected in the financial penalties the legislature has imposed for cattle theft. Although these penalties may not be instructive in every case where exemplary damages have been imposed for conduct constituting theft, *see* 315 S.W.3d at 881 n.82, we think they can provide guidance regarding appropriate sanctions for Bennett and Bonham Corporation's

9

conduct here. *See id.* at 881. Deferring to these legislative judgments, we hold that due process permits exemplary damages awards against Bennett and Bonham Corporation of not greater than $10,000 each.

Accordingly, we affirm the district court's judgment conditioned on the remittitur by Reynolds of $240,000 as to Bennett (reducing the exemplary damages award against him from $250,000 to $10,000), and $990,000 as to Bonham Corporation (reducing the exemplary damages award against it from $1 million to $10,000). *See* Tex. R. App. P. 46.3. If Reynolds files these remittiturs with the clerk of the district court within thirty days of this opinion and judgment and notifies this Court of such, we will reform the district court's judgment and, as reformed, affirm. Otherwise, we will reverse the district court's judgment and remand the cause for a new trial.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Henson

Affirmed Conditioned on Remittitur

Filed: November 18, 2010

10