**Affirm in part; Reverse in part and Remand and Opinion Filed September 26, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00236-CV**

**WILLIAM LISLE AND SMITH-LISLE HOLDINGS, LTD., Appellants**
**V.**
**DO-MO JOINT VENTURE, Appellee**

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-00639-2015**

## MEMORANDUM OPINION ON REHEARING

Before Justices Partida-Kipness, Nowell, and Rosenberg[1]
Opinion by Justice Nowell

Before the Court is the motion for rehearing filed by appellant Smith-Lisle

Holdings, Ltd. We grant the motion for rehearing in part and deny the motion in part.

We withdraw our May 10, 2023 opinion and vacate our judgment of that date. The

following is now the opinion of the Court.

DO-MO Joint Venture owns property on 14th Street in Plano, Texas, where it

operates medical and dental practices. Dr. Curtis Crandall and Dr. John Findley work

---

[1] The Hon. Barbara Rosenberg, Justice, Assigned

at the DO-MO office. Smith-Lisle Holdings, Ltd. (SLH) purchased the lots adjacent to DO-MO in 2013, and its sole owner, William Lisle, operated a landscaping business from the SLH property. A series of disagreements arose between the Lisle Parties and DO-MO, and those disagreements culminated in this lawsuit. After submitting their disputes to a jury, the jury found in DO-MO's favor. The Lisle Parties appeal from the final judgment and raise seven issues on appeal. We reverse the trial court's judgment in part, affirm in part, and remand for further proceedings.

## FACTUAL BACKGROUND

SLH's and DO-MO's properties both front 14th Street near its intersection with N Avenue. An alley from N Avenue runs behind the DO-MO property and dead-ends into SLH's property.



### A. Border Vegetation and Wall

Seeking to improve the appearance of SLH's property, Lisle tore down an existing abandoned house, built a small office building, and started landscaping. As part of the re-landscaping work, Lisle removed vegetation on the SLH—DO-MO property line, installed a trench to build a wall near the property line, and diverted the flow of rain water away from SLH's property.

Lisle began by removing a hackberry tree that was wholly on SLH's property. After cutting down the first tree, the Lisle Parties received a letter dated October 4, 2013, from DO-MO's counsel, which states:

> Since your purchase of 1414 14th Street, you have violated
> Domo' [sic] property rights by committing trespass and by unlawfully

–3–

destroying Domo's trees.[2] And based on representations made by you, you intend on committing further unlawful acts by destroying more of Domo's trees, its shrubbery, and the root system to its trees.

You are hereby ordered to cease and desist from violating Domo's property rights. If you insist on committing trespass, destroying Domo's property, and further violating Domo's property rights, I will [sic] no option but to seek a temporary restraining order and an injunction against you.

Three days later, DO-MO's counsel sent a second letter to the Lisle Parties:

My client is concerned about the trees/vegetation that form the border between its property and Smith-Lisle Holdings, Ltd.'s property and the root systems of its trees/vegetation.

The trees and vegetation that comprise the border between the two properties belong to Domo and Smith-Lisle Holding's [sic] jointly or as tenants in common. As such, neither party is at liberty to cut these trees/vegetation without the consent of the other, nor cut away the part which extends into its land. . . . Thus, Smith-Lisle Holdings, Ltd. does not have the right to cut down/cut back or damage the trees/vegetation the [sic] form the common border between the two properties.

Regarding the root system of Domo's trees/vegetation, Smith-Lisle Holdings, Ltd. does not have the absolute right to damage their root systems.

On October 16, 2013, the Lisle Parties' counsel responded:

I am writing to respond to your letter to my client of October 7, 2013. My client would like to do everything in its power to minimize the risk of damage to surrounding property, but he is entitled to develop his property in compliance with applicable law.

**Border Trees/Vegetation and Root Systems**

We agree that it is settled law in Texas that parties may not remove or cut back border trees or vegetation without the consent of the owner of the adjacent tract of land. You also assert (and we agree) that [SLH] must act reasonably in how it develops its property in order to avoid

---

[2] DO-MO conceded at trial that the hackberry tree that Lisle first cut was not on its property and its lawyer's representation to the contrary was incorrect.

damage to the root systems. [SLH] might damage roots in the process, but, as long as it acts reasonably, such damage will not be actionable.

At the time the October 16 letter was sent, Lisle had only removed the hackberry tree. Despite knowing DO-MO wanted to keep the trees on the property line, Lisle proceeded to remove vegetation on the property line without DO-MO's permission, including a 20-inch, healthy ash tree that straddled the property line. The jury saw pictures of some of the vegetation Lisle removed. Lisle testified his attorney told him he had to act reasonably with respect to border trees. He interpreted this instruction to mean it was reasonable to remove something he did not want on his property, but it was not reasonable to leave half of a tree because it was on someone else's property. Lisle testified he did not intend to injure DO-MO when he cut down the tree, and he did not view the tree as something valuable to DO-MO.

Lisle conceded that to remove the ash tree, he or his employees went "[a] few inches" onto DO-MO's property; he also testified "the blade would have had to cross the property line in making the cut." Additionally, the stump grinder used to remove the stump from a pecan tree he cut down crossed the property line.

Lisle also wanted to build a six-foot stone screening wall between the properties. He testified he reached out to DO-MO's manager, Dr. Curtis Crandall, about building the wall and provided a picture of the proposed wall, but Crandall did not respond. Because Crandall did not respond to his calls, Lisle "[e]ventually . . .

just got started on my wall." To build the wall, Lisle severed the roots of vegetation along the property line without DO-MO's permission.

In contrast to Lisle's testimony, the record includes a November 21, 2014 letter that DO-MO's counsel sent to counsel for the Lisle Parties. The letter states:

> Bill Lisle provided my client with a copy of the attached proposal for a "6' New Fence, 6' brick with 7' rock columns," and asked for my client's response. I wanted to contact you today because Mr. Lisle said that he planned to start construction next week (the week of November 24), if he didn't hear from DOMO.
> . . .
> Second, Mr. Lisle proposes to "remove all existing vegetation." To the extent that DOMO has an ownership in any vegetation to be cut or removed, or whose root system is to be damaged or affected, DOMO doesn't currently agree to Mr. Lisle's proposal.
> Third, DOMO is concerned with Mr. Lisle's proposal insofar as it will likely worsen the drainage problem he has already created at the southeast edge of the property and possibly cause further diversion or retention of water on DOMO's property, thus creating additional damage to DOMO's property.
> . . .
> In any event, DOMO is willing to consider further information about Mr. Lisle's project.

## B. Flooding DO-MO's Property

Historically, rainwater flowed from DO-MO's parking lot, into the alley, and on to the SLH property. Approximately six months after SLH purchased the property, Lisle noticed water running through the alley and on to his property "like a river" after a rainstorm. Lisle told Crandall "to keep your water on your property" and he was considering building a wall to stop the water. Lisle then built a concrete driveway that is approximately eight inches above the DO-MO parking lot and a gravel ramp to connect the driveway to the city alley. After Lisle installed the new

driveway and ramp, rainwater stopped flowing from DO-MO's parking lot on to SLH's property and instead it collected on DO-MO's parking lot.

Lisle testified the water from DO-MO's property historically did not flow on to the SLH property. Rather, the water from DO-MO's property flowed into the alley, so he did not block the flow of water from DO-MO's property when he built the driveway and ramp. Lisle testified:

> Q.     And what you were intending to do was stop the flow of water that had been flowing there before you bought the property? You were trying to stop it flowing onto your property, right?
> A.     Yes.
> Q.     And you intentionally set about to stop that water from getting onto your property?
> A.     Yes.
> . . .
> Q.     Sir, did you tell [DO-MO] you were going to stop - - told [DO-MO] you were going to stop the water from either the City or their property flowing onto your property?
> A.     Yes. I let them know, and I also let the City engineering department know that there's no easement for flooding my property with everyone else's water.
> . . .
> Q.     . . . that's the pitch point for where all the water will flow, correct?
> A.     Yes.
> Q.     And so if the water is stopped there, it's got to go somewhere, right?
> A.     Yes, water's going to seek its own level.
> Q.     And is going to seek its level not only in the city alley but on my client's property, and you've actually seen that, haven't you?
> A.     Yes, it pools there.
> Q.     The water did not pool there before you started this project, did it?
> A.     That's correct.
> Q.     And after you started all the project, it began pooling there, correct?

A. That's correct.

Q. So in effect, what you did was have [sic] diverted the flow of the water onto the alley and my client's property, right?

A. Yes.

. . .

Q. And you intentionally did that, didn't you?

A. Yes.

Q. And you knew my clients were opposed to you doing that?

A. Yes.

Q. So it's not just going back in the city alley is it, the water?

A. No, it expands onto your client's property.

. . .

Q. And it was solely through your actions that the water has begun now pooling on my client's property, right?

A. Yes.

After building the driveway and ramp, Lisle testified he went "through extensive efforts to make sure that water does not stand on the DO-MO property," including working with the City to build a drainage swale. Lisle testified that at the time of trial, 100 percent of the water from DO-MO's property flowed off of DO-MO's property and into the drainage swale unless "it's really raining hard and the swale is not handling all the water, [then] the water will still come down next to the southern edge of my driveway and still flood into my property."

## C. DO-MO's Driveway and Parking Lot

Lisle owns and operates a landscaping business from the property. His landscaping crews drive pickup trucks (some with trailers) through the alley behind DO-MO's property. The landscaping business also receives deliveries that may be transported on large trucks.

Findley and Crandall testified that before SLH purchased its property, they had not seen any large trucks around DO-MO's property. However, after SLH purchased the property, "semitrucks, the grass trucks, and stone trucks, and those kinds of things" began driving on DO-MO's parking lot. Findley testified: "To the best of my knowledge, I never remember semis coming through our parking lot until Mr. Lisle moved in."

The jury saw pictures of several dozen trucks, heard testimony about whether the trucks belonged to the Lisle Parties, and heard testimony about whether the trucks were in the alley or on DO-MO's parking lot. As to a picture of one truck, Lisle testified it was not his truck, but the truck appeared to be coming from his property and on to the alley; Lisle gave the driver permission to be on his property. When asked why the truck drove "through the DO-MO property," Lisle replied: "Because they were idiots."

Findley testified he saw trucks that were driving to or from SLH's property on to DO-MO's property. Findley provided conflicting testimony about ownership of the trucks. When he was asked if he knew whether any of the trucks in the pictures belong to Lisle, he replied: "Yes, sir, I do very definitely." He also testified he did not know who the trucks belonged to. Findley did not know whether Lisle told any driver to drive on the DO-MO parking lot, but he thought Lisle approved of the various trucks driving through DO-MO's property.

When asked whether he had actual knowledge whether the trucks were Lisle's trucks or coming from Lisle's property, Crandall testified "Yes, it's very easy to see that they were coming in and out of his property." Later in his testimony, when looking at the trucks in the pictures, Crandall could not testify whether the trucks belonged to Lisle or people acting at Lisle's direction.

Lisle testified his trucks did not cross on to DO-MO's property and "[t]here are no truck pictures of my trucks on their property." Lisle explained: "I can tell you that I have made it very clear to them they could use the alley, and they should never cross the parking lot."

DO-Mo hung "no trespassing" signs four times to try to divert traffic off its the parking lot, but, Findley testified, "the next morning when I'd come in, [the signs would] be gone." Lisle testified he had "no idea" what happened to the signs, but neither he nor his employees removed them. DO-MO's legal counsel sent an email on April 7, 2015, to the Lisle Parties' counsel stating:

> Unfortunately, your client is not telling you the truth. Your client continues to trespass and I'm formally notifying you, pursuant to applicable Texas law that DO-MO property is **POSTED NO TRESPASSING** as the property relates to your client. Please advise him immediately of this notification.
> He is not a business invitee and is specifically prohibited either directly or indirectly by his employees or independent contractors from trespassing on any of my clients' property.
> I am attaching photographs of your client's trucks driving all over my clients' property over the last four business days. The last photo, as it says, is one of your client's trucks in my client's parking lot this morning. Those trucks are going to destroy the asphalt driveway and we intend to sue your client to replace the entire parking lot.

Despite the signs and the April 2015 email, the trucks did not stop driving on DO-MO's property. Crandall testified: "Sometimes we talked about it like a parade" because there were so many trucks. Eventually DO-MO erected "big concrete barricades" with connecting steel cables to keep the trucks off their parking lot.

Findley testified the trucks damaged DO-MO's asphalt parking lot. Crandall also testified the trucks damaged the parking lot by creating more potholes and cracks in the asphalt. Conversely, Lisle argued there was no evidence that the trucks destroyed DO-MO's parking lot. Lisle believed the damage to DO-MO's parking lot was caused by the trash trucks that entered DO-MO's property to empty its dumpsters.

The case was submitted to a jury, and the jury found in favor of DO-MO. The jury found Lisle and SLH trespassed on DO-MO's property, diverted or impounded the natural flow of surface waters in a manner that damaged DO-MO's property, and were negligent. The jury awarded damages and exemplary damages. The trial court entered its final judgment based on the jury's verdict. This appeal followed.

LAW & ANALYSIS

A. **Trespass on DO-MO's Property**

In their first issue, the Lisle Parties argue DO-MO failed to present more than a scintilla of evidence that their trucks trespassed on DO-MO's property or they caused any other trucks to trespass on DO-MO's property and, as a result, the

evidence is insufficient to support the jury's trespass finding or award of corresponding damages.

"Trespass to real property is an unauthorized entry upon the land of another, and may occur when one enters—or causes something to enter—another's property." *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 46 (Tex. 2017); *see also Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 419 (Tex. 2015) (listing elements of trespass as: (1) entry (2) onto the property of another (3) without the property owner's consent or authorization). "[E]very unauthorized entry upon land of another is a trespass even if no damage is done or injury is slight." *Lightning Oil Co.*, 520 S.W.3d at 46.

### 1. Standard of Review

When, as here, a party challenges the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof, the party must demonstrate that no evidence supports the finding. *Tex. Champps Americana, Inc. v. Comerica Bank*, 643 S.W.3d 738, 744 (Tex. App.—Dallas 2022, pet. denied). When determining whether the evidence is legally sufficient to support the challenged finding, we review the evidence in the light most favorable to the finding. *Id.* We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

Anything more than a scintilla of evidence is legally sufficient to support the challenged finding. *Id.* More than a scintilla of evidence exists "when the evidence

–12–

as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014). When a legal sufficiency point is sustained, the appellate court's duty is to reverse and render. *Thomas v. Am. Express Nat'l Bank*, No. 05-22-00024-CV, 2022 WL 17843546, at *1 (Tex. App.—Dallas Dec. 22, 2022, no pet.) (mem. op.) (citing *Heritage Resources, Inc. v. Hill*, 104 S.W.3d 612, 619 (Tex. App.—El Paso 2003, no pet.)).

2.      *Analysis*

The jury was asked whether the Lisle Parties trespassed on DO-MO's property in Question 1, which states:

> **Did any of those named below trespass on Plaintiff DoMo Joint Venture's property?**
> "Trespass" means an entry on the property of another without having consent or authorization of the owner. To constitute trespass, entry upon another's property need not be in person, but may be made by causing or permitting a thing to cross the boundary of the property.
> Any person who assists, advises, or encourages the commission of the trespass is liable as a trespasser.

The jury answered "yes" for both Lisle and SLH.

Although the Lisle Parties challenge the sufficiency of the evidence showing their trucks or trucks authorized by them trespassed on DO-MO's property, Question 1 is not limited to whether trucks trespassed on DO-MO's property. The Lisle Parties do not challenge the sufficiency of the evidence that they trespassed on DO-MO's property when they removed the border vegetation, and there is sufficient evidence

–13–

to support the jury's answer to Question 1 on this basis alone. Lisle testified he removed the ash tree, including the portion on DO-MO's property. To do so, he (or persons he employed) crossed the property line and the blade to cut the tree had to cross the property line. Additionally, the stump grinder crossed the property line on to DO-MO's property.

There is also sufficient evidence that trucks trespassed on DO-MO's property. Before SLH purchased its property, Crandall and Findley had not seen any semitrailers or large trucks around DO-MO's property. However, after SLH purchased the property, "semitrucks, the grass trucks, and stone trucks, and those kinds of things" began driving on DO-MO's parking lot. Findley and Crandall both testified the Lisle Parties' trucks or trucks authorized by them drove on DO-MO's property. Findley testified:

> Q.    In fact, can you swear as a witness under oath that any of the trucks that you have seen in these pictures that [DO-MO's counsel] showed you belong to Bill Lisle?
> A.    Yes, sir, I do very definitely.

Similarly, when asked whether he had actual knowledge the trucks were Lisle's trucks or coming from Lisle's property, Crandall testified "Yes, it's very easy to see that they were coming in and out of his property."

Viewing this and other evidence in the light most favorable to the jury's finding and crediting favorable evidence where a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not, we conclude

–14–

there is more than a scintilla of evidence to support the jury's finding that the Lisle Parties trespassed on DO-MO's property. We overrule the Lisle Parties' first issue.

### B. Damages

The Lisle Parties also challenge the damages awarded for trespassing on DO-MO's property. In their fourth issue, the Lisle Parties argue the evidence is legally insufficient to support any amount of damages awarded to repair DO-MO's parking lot.[3] The Lisle Parties assert Crandall's testimony is insufficient to support the damages award because Crandall's testimony is conclusory and speculative and he did not testify about the cost to repair as charged in Question 6. In response, DO-MO argues Crandall's testimony is sufficient evidence and the Lisle Parties failed to object to much of the testimony. We again apply the legal sufficiency standard set forth above.

#### 1. Jury Question 6

The jury found Lisle and SLH trespassed on DO-MO's property (Question 1) and Lisle and SLH diverted or impounded the natural flow of surface waters or permitted a diversion or impounding of surface waters to continue in a manner that damaged DO-MO's property by the overflow of the water diverted or impounded

---

[3] The Lisle Parties do not challenge the damages awarded to DO-MO to compensate for the Lisle Parties destroying trees and other vegetation.

(Question 2).[4] Based on these findings, the jury was instructed to answer Question 6, which asks:

> **What sum of money, if paid now in cash, would fairly and reasonably compensate DoMo Joint Venture for its property damages [sic] to the parking lot, if any, that resulted from the following actions in question regarding the parking lot?**
>
> Consider only the reasonable cost to restore the parking lot to the condition it was in immediately before the occurrences in question.
>
> Do not include any amount for any condition not resulting from the acts or omissions in question.
>
> Do not include any amount for any condition existing before the damages in question.
>
> Do not include any amount for any condition resulting from the failure, if any, of DoMo Joint Venture to have acted as a person of ordinary prudence would have done under the same or similar circumstances in mitigating its damages, if any, that resulted from the actions or omissions in question.
>
> Do not include interest on any amount of damages you find. Answer in dollars and cents for damages, if any.
>
> **Alleged impounding of natural flow of surface waters in the southeastern area of the DoMo parking lot adjacent to the City alley.**
>
> Answer: *$35,000.00*
>
> **Alleged traversing of parking lot by Defendants' trucks.**
>
> Answer: *$125,000.00*

---

[4] We assume for purposes of our analysis that the evidence is sufficient to support the jury's answer to Question 2.

## 2. *Property-Owner Rule*[5]

The Property Owner Rule establishes that an owner is qualified to testify to property value. *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012). The rule "falls under Texas Rule of Evidence 701, which allows a lay witness to provide opinion testimony if it is (a) rationally based on the witness's perception and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *Id.* at 157 (citing TEX. R. EVID. 701). Under the Rule, an owner's valuation testimony fulfills the same role that expert testimony does. *Id.*

The property owner's testimony must meet the same requirements as any other opinion evidence. *Id.* at 156. Opinion testimony "that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable.'" *Id.* In *Justiss*, the Texas Supreme Court elaborated:

> Because property owner testimony is the functional equivalent of expert testimony, it must be judged by the same standards. Thus, as with expert testimony, property valuations may not be based solely on a property owner's *ipse dixit*. An owner may not simply echo the phrase "market value" and state a number to substantiate his diminished value claim; he must provide the factual basis on which his opinion rests. This burden is not onerous, particularly in light of the resources available today. Evidence of price paid, nearby sales, tax valuations, appraisals, online resources, and any other relevant factors may be offered to support the claim. But the valuation must be substantiated; a naked assertion of "market value" is not enough. Of course, the owner's

---

[5] Because the parties agree Crandall could testify to damages pursuant to the Property Owner Rule, for purposes of this appeal, we assume the Property Owner Rule applies to Crandall's testimony.

testimony may be challenged on cross-examination or refuted with independent evidence. But even if unchallenged, the testimony must support a verdict, and conclusory or speculative statements do not.

*Id.* at 159.

### 3. *Crandall's Proffered Damages Testimony*

As the managing partner of DO-MO, Crandall testified about damages to DO-MO's parking lot. He explained that asphalt parking lots like DO-MO's must be maintained and have a life span. In July 1998, DO-MO received an estimate to repair its parking lot; the estimate states the parking lot "appears to be about 25 years old and has reached the end of its normal life cycle." Crandall agreed that when SLH purchased its property in 2013, DO-MO's parking lot was more than thirty years old and at least needed maintenance.

Historically, DO-MO repaired the parking lot every "three years or so." The record includes several written work proposals and invoices from companies to repair the asphalt or striping; these documents are dated before 2011. Crandall believed that when SLH purchased its property in 2013, DO-MO's parking lot needed another application of asphalt as it was near the end of the three-to-four year cycle. However, DO-MO did not repair the lot because trucks continued trespassing on and causing damage to its lot, and DO-MO wanted to fix the driveway only once.

Crandall testified that in 2017, DO-MO's parking lot had been sufficiently damaged by trucks and traffic that DO-MO opted to pour a large concrete pad in the parking lot and a small concrete pad at the exit to N Avenue; DO-MO did not

–18–

resurface or replace the entire lot at that time. The cost of the two concrete pads was $44,000.

Crandall testified that as a result of the trucks irreparably damaging the DO-MO parking lot, the entire parking lot needed to be replaced. Crandall explained his understanding that, pursuant to the City of Plano codes,[6] when forty percent of a parking lot needs to be replaced in a twelve-month time period, then the entire lot must be replaced. Accordingly, to bring the parking lot into code compliance, Crandall believed DO-MO needed to replace the entire lot. Explaining what must be done to fix the asphalt parking lot, Crandall testified:

> The estimates and the people that I talked to that came out and the reading that I've done, I've learned that - - this is kind of interesting - - what they call the base, the 10-inch or 11-inch depth, has to be essentially redone. And so they grind up and take away excess pavement that's already there and then they mix in - -

Crandall's testimony was interrupted by the Lisle Parties' request for a bench conference, and this line of questioning did not resume.

Crandall testified he attempted to determine the size of the parking lot: "When I get comparative bids from different companies, they give me an estimate of their measurement, and the two most recent ones estimated 25,600 square feet and the other one was 26,600 square feet. And then I also used Google Earth and tried to do

---

[6] Crandall testified about "the City of Plano's codes" without specifying which code or codes.

my own, and it came up lower at about 22,500 square feet." The bids do not appear in the record.

Crandall testified $200,000 would allow DO-MO to "fix" the parking lot:

> Q.     And you arrived at that number from talking to different estimators?
> A.     Correct.
> Q.     And did you look at various numbers about what you'd already paid people?
> A.     Yes, and conversation.
> Q.     Okay. And do you have an opinion on whether that amount is reasonable to repair the damage from both water and these 18-wheelers and the trucks driving on your parking lot?
> MR. DOWNS: Your Honor, I object that the question - - or excuse me - - the witness has not yet been qualified to give this testimony.
> THE COURT: Overruled.
> A.     As the property owner, it's my opinion that the $200,000 would allow us to fix the parking lot.

The $200,000 estimate did not include the $44,000 repair from 2017.

When asked how he educated himself about the cost to repair the parking lot, Crandall testified he has received multiple estimates from contractors, including Rose Paving and Elite Asphalt. He stated an Elite Asphalt company representative visited DO-MO's property to provide an estimate "to make us a good parking lot." He went through a similar process with a representative from Rose Paving. With respect to the estimates he received, Crandall did not testify about how much the companies stated the work would cost or whether they were to repair the damage caused by the Lisle Parties or to replace the entire lot, and the estimates do not appear

in the record. The $200,000 figure did not include depreciation because, Crandall testified, "that doesn't help me get a new one [parking lot]."

When asked whether he attempted "to determine what the fair market value would be to fix the parking lot at DO-MO," Crandall responded he "spent a good amount of time on that," but provided no additional information.

### 4. Analysis

Crandall testified that $200,000 would allow DO-MO to "fix" the parking lot, and he explained he asked an estimator "to make us a good parking lot." Crandall's testimony is unclear whether the amount to "fix" the parking lot or to "make us a good parking lot" is the cost of replacing the lot or repairing the damage caused by the Lisle Parties. The jury was asked to provide the reasonable amount to repair the parking lot.

If we assume the evidence shows $200,000 is the cost to repair the parking lot as provided for in the jury charge, Crandall provided no factual basis for this amount of money. Crandall testified he solicited estimates, but he provided no information about these estimates and the bids do not appear in the record. Crandall testified that representatives from two companies looked at the parking lot, but he did not testify about their estimates to repair the parking lot. Crandall did not testify that either of them bid $200,000 or more or less to do the work he believed was needed.

While Crandall testified that the City of Plano codes require an entire parking lot be replaced when forty percent of it will have to be replaced in a twelve month

period of time, he did not testify that forty percent of the DO-MO parking lot would need to be replaced in a twelve month period of time or, if he had, on what basis he reached this conclusion.

Further, Crandall provided three inconsistent estimates of the size of the existing parking lot, but he did not explain why the size of the parking lot was relevant to the amount of damages DO-MO sought. Crandall's testimony does not indicate whether $200,000 is the cost to repair a 26,600, 25,600, or 22,500 square foot parking lot; the difference between the largest and smallest size estimates is 4,100 square feet and more than fifteen percent. Presumably a fifteen percent difference in size affects the cost of repair.

There also is no evidence that the $200,000 figure is a reasonable amount to repair the parking lot; the only evidence related to the $200,000 figure is that it is the amount Crandall thinks would allow DO-MO to "fix" the parking lot.

Additionally, the jury was instructed to only consider the reasonable cost to restore the parking lot to the condition it was in immediately before the occurrences in question and not to consider any amount for any condition existing before the damages in question. At the time SLH purchased its property, the parking lot needed to a new application of asphalt or needed to be replaced entirely. Crandall's testimony that he did not consider depreciation indicates he did not account for the existing state of the parking lot before any damage by the Lisle Parties. Instead, he asked for an amount he believed would allow him to fix a parking lot that was in

need of repair prior to SLH's purchase of the property. Crandall's testimony indicates he failed to account for any condition existing before the damages in question or not resulting from the acts or omissions in question.

Finally, the jury was asked to make separate awards for the damage caused by flooding and by trespassing trucks. However, Crandall made no effort to provide damages calculations resulting from these two categories; instead, Crandall provided a blanket, unsupported figure of $200,000 to fix the parking lot.

### 5.    *Conclusion*

Crandall's declaration that $200,000 is the amount needed to "allow us to fix the parking lot," is mere *ipse dixit*, which is insufficient to support DO-MO's request for damages as awarded in Question 6. The valuation he provided is wholly unsubstantiated; Crandall provided no factual basis on which his opinion rests. *See Justiss*, 397 S.W.3d at 159. Instead, he provided "a naked assertion" of the cost to repair or replace the parking lot. *See id.* Because Crandall's testimony is conclusory, it is not relevant; it does not make the existence of a material fact more or less probable. *See id.* at 156. The fact that much of his testimony was not objected to is not determinative. *See id.* at 159 ("But even if unchallenged, the testimony must support a verdict, and conclusory or speculative statements do not."). DO-MO did not present any other damages evidence. Accordingly, we conclude DO-MO presented no evidence to support the damages awarded in Question 6. We sustain the Lisle Parties' fourth issue.

### 6. *Exemplary Damages*

On rehearing, SLH asks that we re-evaluate the award of exemplary damages in light of our resolution of the Lisle Parties' fourth issue. *See Bunton v. Bentley*, 153 S.W.3d 50, 53 (Tex. 2004) ("A complaint that arises from the court of appeals' judgment itself . . . may be raised either in a motion for rehearing in the court of appeals or in a petition for review in this Court."). "[E]xemplary damages must be reasonably proportionate to compensatory damages, and that adjustment of compensatory damages therefore requires reevaluation of the factors supporting an award of exemplary damages." *Id.* Exemplary damages should not be adjusted by a mathematical formula; instead, each of the factors supporting the exemplary damages should be reevaluated in light of the actual harm suffered by the plaintiff. *Id.*

Sustaining the Lisle Parties' fourth issue results in a significant reduction in the actual damages that will be awarded to DO-MO, which changes the ratio between actual damages and exemplary damages awarded unless the exemplary damages are reassessed. In light of the reduced award of actual damages, we vacate the trial court's exemplary damages award. We remand the issue for the trial court to consider the amount of exemplary damages, if any, to assess against SLH. *See Sohani v. Sunesara*, No. 01-20-00114-CV, 2023 WL 1112165, at \*21 (Tex. App.—Houston [1st Dist.] Jan. 31, 2023, pet. filed) (mem. op.) (remanding for calculation of exemplary damages) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S.

408, 418, 426 (2003) (setting out three "guideposts" for determining whether exemplary damages award is grossly excessive in violation of federal due process protections and stating that courts "must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered"); *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981) (stating that whether actual and exemplary damages awards are reasonably proportioned depends on facts of particular case); *JNM Express, LLC v. Lozano*, 627 S.W.3d 682, 700 (Tex. App.—Corpus Christi–Edinburg 2021, pet. filed) (setting out factors to consider when determining whether exemplary damages award is excessive)); *see also Suarez v. Fernandez*, No. 05-18-00921-CV, 2019 WL 1922732, at *4 (Tex. App.—Dallas Apr. 30, 2019, no pet.) (mem. op.) (remanding for trial court to consider amount of exemplary damages, if any, to award).

### 7. *Unaddressed Issues*

In light of our resolution of the Lisle Parties' fourth issue, we need not consider their second issue in which they argue the evidence is insufficient to support the jury's finding that they caused damage to DO-MO's parking lot; their third issue in which they argue the trial court abused its discretion by overruling their motion to exclude DO-MO's evidence about the amount of damages to the parking lot because DO-MO failed to disclose the amount and method of calculating damages; or their seventh issue in which they argue the trial court incorrectly charged the jury

in Questions 1 and 2 by including an instruction on "assisting trespass" and excluding the definition of "natural flow."[7] *See* TEX. R. APP. P. 47.1.

### C.     Bifurcation of the Trial

In their fifth issue, the Lisle Parties argue the trial court abused its discretion by denying their motion to bifurcate the trial as required by civil practice and remedies code section 41.009. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.009. Before voir dire began, counsel for the Lisle Parties stated:

> Your Honor, if I may, one more housekeeping matter before voir dire begins. Defendant [sic] moves [sic] for a bifurcated trial on the issue of punitive damages which may impact what people ask during voir dire.

The judge responded: "Let's go off the record," and the reporter's record indicates there was a discussion off the record. The record provides no additional information about what occurred with respect to the Lisle Parties' oral motion, but the trial was not bifurcated. The Lisle Parties assert the court denied the motion.[8]

The record does not reflect whether the trial court made a ruling on the motion to bifurcate. The relevant arguments, discussions, and ruling, if any, were held off the record, and the trial court's ruling, if any, was not later put on the record. Accordingly, we cannot determine the trial court's ruling, if any, from the record

---

[7] To the extent the Lisle Parties' seventh issue includes the single sentence that "the evidence is legally insufficient to support the finding that the water at issue is 'surface water' as Appellees were required to prove," we conclude this purported argument is not briefed, and we do not consider it. *See* TEX. R. APP. P 38.1 (requirements of appellant's brief).

[8] The Lisle Parties and DO-MO filed post-submission letters with this Court providing their recollections about what occurred during the off-the-record discussion. Their recollections of the discussion and trial court ruling, if any, are inconsistent.

before us. We conclude the Lisle Parties have not preserved any complaint regarding any ruling by the trial court about bifurcation for review. *See* TEX. R. APP. P. 33.1; *see also In re A.D.M.*, No. 11-19-00131-CV, 2019 WL 5078595, at *3 (Tex. App.—Eastland Oct. 10, 2019, no pet.) (mem. op.) (complaint about off-the-record exchange not preserved for appeal).; *Drake v. Chase Bank*, No. 02-13-00340-CV, 2014 WL 6493411, at *3 (Tex. App.—Fort Worth Nov. 20, 2014, no pet.) (mem. op.) (same).

The Lisle Parties also argue the trial court implicitly denied the motion to bifurcate and, accordingly, the issue is preserved for our review.[9] *See* TEX. R. APP. P. 33.1. To support this argument, the Lisle Parties cite the following comments the judge made on the record after jury selection:

- We've already said you were going to be able to talk about his finances for the purposes of punitive damages.
- We've already said you could do that
- We had already said you could do that so I'm trying to figure out why we're still having this conversation.

"An implicit overruling is one that, though unspoken, reasonably can be inferred from something else." *Trevino v. City of Pearland*, 531 S.W.3d 290, 299 (Tex. App.—Houston [14th Dist.] 2017, no pet.). To preserve error, an implicit ruling must be ascertainable from the record. *Strunk v. Belt Line Rd. Realty Co.*, 225 S.W.3d 91, 99 (Tex. App.—El Paso 2005, no pet.). A ruling might be implied from

---

[9] We note the Lisle Parties' argument that the motion was implicitly denied is inconsistent with their representation to the Court that the trial court denied their motion during the off-the-record conversation.

the record when the implication is "clear." *Seim v. Allstate Tex. Lloyds*, 551 S.W.3d 161, 166 (Tex. 2018).

In this case, the trial judge's statements cited by the Lisle Parties do not imply the trial court's ruling on their motion to bifurcate; the trial judge's statements indicate a decision was made that financial information could be discussed but do not indicate the motion to bifurcate was denied. In his post-submission letter, DO-MO's counsel represented to the Court that the parties reached an agreement not to bifurcate the trial; the Lisle Parties' counsel disputes this representation. The trial judge's statements cited by the Lisle Parties are as consistent with DO-MO counsel's representations to this Court as they are to the Lisle Parties' assertion the trial court denied the motion to bifurcate. We conclude the trial court's ruling is not clear from the statements upon which the Lisle Parties rely. Based on this record, it is not reasonable for us to conclude that the trial court implicitly denied the motion to bifurcate.

We overrule the Lisle Parties' fifth issue.

### D.     Evidence of Malice

In their sixth issue, the Lisle Parties argue DO-MO presented legally insufficient evidence that they harbored a specific intent to cause substantial harm to DO-MO, as is required to support a finding that the Lisle Parties acted with malice.

Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery

of exemplary damages results from fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE. ANN. § 41.003. Jury Questions 7 and 8 asked whether the jury found by clear and convincing evidence that the damages to DO-MO resulted from malice on the part of Lisle (Question 7) or SLH (Question 8). In both questions, malice was defined as a specific intent by Lisle (Question 7) or SLH (Question 8) to cause substantial injury or harm to DO-MO.

In a legal sufficiency review of findings requiring proof by clear and convincing evidence, an appellate court must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 609 (Tex. 2004). We presume that the trier of fact resolved disputed facts in favor of its findings if a reasonable factfinder could do so. *Id.* at 627. We disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *Id.*

As to the removal of border vegetation, the Lisle Parties agree the evidence shows they intended to act when they removed the border vegetation, but, they argue, the work was done in an effort to improve their property and is not evidence they intended harm DO-MO. In response, DO-MO argues the evidence shows the Lisle Parties knew they could not remove the border vegetation without DO-MO's consent and DO-MO opposed the removal of the vegetation, but the Lisle parties proceeded anyway.

–29–

After Lisle removed the hackberry tree on SLH's property, the Lisle Parties received a letter notifying them that DO-MO opposed any removal of vegetation from its property. A few days later, the Lisle Parties received another letter informing them that the border vegetation was owned by DO-MO and SLH jointly or as tenants in common and, as such, neither party could cut the trees or vegetation without the consent of the other. Further, the letter stated, the Lisle Parties did not have the absolute right to damage the root system of DO-MO's trees and vegetation. The Lisle Parties' counsel responded:

> *We agree that it is settled law in Texas that parties may not remove or cut back border trees or vegetation without the consent of the owner of the adjacent tract of land*. You also assert (*and we agree*) that [SLH] must act reasonably in how it develops its property in order to avoid damage to the root systems. [SLH] might damage roots in the process, but, as long as it acts reasonably, such damage will not be actionable.

(Emphasis added). Shortly after their counsel acknowledged DO-MO's rights, Lisle removed a 20-inch, healthy ash tree that straddled the property line along with other border vegetation. Lisle knew that removing the portion of the tree on his property would necessitate removing the portion of the tree on DO-MO's property. He also knew that cutting the root systems of the vegetation would damage the vegetation on DO-MO's property and DO-MO was opposed.

Shortly before the Lisle Parties began trenching for the border wall, they received a letter from DO-MO's counsel stating DO-MO did not agree to the removal or damage of their vegetation on the property line. However, they

disregarded DO-MO's wishes and the damage they knew would be caused to DO-MO's vegetation because they wanted to build their border wall.

The Lisle Parties' actions in removing the tree and other vegetation without DO-MO's consent reveal their disregard for DO-MO's right to maintain its property in the way it saw fit. *See Wilen v. Falkenstein*, 191 S.W.3d 791, 801 (Tex. App.—Fort Worth 2006, pet. denied) (affirming jury's malice finding when party "topped" neighbor's tree because tree blocked his view). By the time the Lisle Parties removed the border vegetation to install the trench and start building the border wall, the parties had on-going disputes and had engaged legal counsel. From this evidence, the jury could have formed a firm belief or conviction that there was nothing accidental about the Lisle Parties' repeated conduct and they specifically intended to injure DO-MO when they removed the trees and later when they began building the trench. *See Bennett v. Reynolds*, 315 S.W.3d 867, 872 (Tex. 2010) ("The jury could have reasonably formed a firm belief or conviction, from the theft itself and from the ongoing hostilities between the parties, that there was nothing accidental about Bennett's conduct and that he specifically intended to injure Reynolds by taking his property.").

Lisle testified he believed he was entitled to remove the portion of the tree that was on his property, and he believed he acted in accordance with his attorney's direction to act reasonably. However, the jury could have disbelieved his testimony or concluded Lisle's actions were not reasonable. Despite their counsel's

correspondence stating a party may not "cut back border trees or vegetation without the consent of the owner of the adjacent tract of land" and noting a party "must act reasonably in how it develops its property in order to avoid damage to the root systems," the Lisle Parties did neither of these things. The jury could have concluded they did not act reasonably to avoid damage to root systems.

Looking at all the evidence in the light most favorable to the finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that the Lisle Parties had a specific intent to cause substantial injury or harm to DO-MO and their actions resulted from malice. We overrule the Lisle Party's sixth issue.

CONCLUSION

We reverse the trial court's judgment awarding monetary damages arising from damage to DO-MO's parking lot from Lisle and SLH. We render judgment that DO-MO cannot recover the jury's award in Jury Question 6 of monetary damages arising from damage to its parking lot from either Lisle or SLH.

We vacate the trial court's exemplary damages award.

We remand the case to the trial court to recalculate actual damages based on the jury's award in response to Jury Question 5, to consider and calculate the amount of exemplary damages, if any, to assess against SLH, and to calculate pre-judgment interest.

In all other respects, we affirm the trial court's judgment.


220236f.p05

/Erin A. Nowell//
ERIN A. NOWELL
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

WILLIAM LISLE AND SMITH-
LISLE HOLDINGS, LTD.,
Appellants

No. 05-22-00236-CV          V.

DO-MO JOINT VENTURE,
Appellee

On Appeal from the 416th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 416-00639-
2015.
Opinion delivered by Justice Nowell.
Justices Partida-Kipness and
Rosenberg participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment awarding monetary damages arising from damage to DO-MO Joint Venture's parking lot from William Lisle or Smith-Lisle Holdings, Ltd. We render judgment that DO-MO Joint Venture cannot recover the jury's award in Jury Question 6 of monetary damages arising from damage to its parking lot from either William Lisle or Smith-Lisle Holdings, Ltd.

We vacate the trial court's exemplary damages award.

We remand the case to the trial court to recalculate actual damages based on the jury's award in response to Jury Question 5, to consider and calculate the amount of exemplary damages, if any, to assess against Smith-Lisle Holdings, Ltd., and to calculate pre-judgment interest.

In all other respects, we **AFFIRM** the trial court's judgment.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 26th day of September, 2023.

–34–